

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-18-00411-CV

**REPSOL OIL AND GAS USA, LLC**, as successor to Talisman Energy USA Inc., Statoil Texas
Onshore Properties LLC, and Statoil Pipelines LLC,
Appellants

v.

**MATRIX PETROLEUM, LLC**, Matrix Petroleum Holdings, LLC, JAR Resources Holdings,
L.P., TMRX Petroleum LLC, and OGE, LLC,
Appellees

From the 218th Judicial District Court, La Salle County, Texas
Trial Court No. 14-08-00158-CVL
Honorable Russell Wilson, Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice
Concurring Opinion by: Beth Watkins, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Luz Elena D. Chapa, Justice
Beth Watkins, Justice

Delivered and Filed: December 27, 2023

AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND
REMANDED IN PART; DISMISSED IN PART

This is a cross-appeal from an oil-and-gas jury trial.  Although much of the final judgment

is unchallenged, all parties, save two, appeal aspects of the judgment.[1]  For the reasons that follow,

we affirm part of the judgment, reverse part of the judgment, render judgment in part, and remand

---

[1] The parties that did not appeal are Statoil Pipelines LLC and Matrix Petroleum LLC; however, each filed appellee's
briefs.

for further proceedings on attorneys' fees. We also dismiss a part of one appeal for lack of jurisdiction.

## BACKGROUND

The parties to this lawsuit were working interest owners in the Cooke Ranch. In 1954, the predecessors to the parties signed a joint operating agreement (the "JOA"). The JOA governs the working interest owners' obligations to produce and share oil and gas. All of the parties took their interests in the Cooke Ranch subject to the terms of the JOA. In addition to the JOA, in 2010, certain of the working interest owners or their predecessors entered into term assignments (the "Term Assignments" or "Assignments"), in which the parties to the Assignments made further commitments to drill wells.

The parties' working relationships eventually deteriorated and led to this lawsuit. After a jury trial, the trial court entered an Amended Final Judgment, from which the parties now appeal. There is some overlap as to the appeals. In general, Repsol Oil and Gas USA, LLC, as successor to Talisman Energy USA Inc. ("Talisman"), and Statoil Texas Onshore Properties LLC ("Statoil Texas") and Statoil Pipelines LLC ("Statoil Pipelines" and collectively with Statoil Texas, "Statoil")[2] are on one side. Talisman and Statoil Texas obtained their working interests subject to the Term Assignments, and, at the time of trial, Talisman and Statoil Texas collectively held leasehold working interests in the Cooke Ranch of just over 63%. After trial, Statoil Texas sold its interest to Talisman, and, as a result of this sale, Statoil Texas's appeal is the subject of two pending motions to dismiss on the grounds that Statoil Texas lacks standing and that its appeal is moot. Statoil Pipelines transported and processed oil and gas produced from Cooke Ranch wells. On appeal, Talisman and Statoil Texas contend the majority of the damages awards against them

---

[2] Statoil Texas and Statoil Pipelines are now known respectively as Equinor Texas Onshore Properties LLC and Equinor Pipelines LLC.

cannot be sustained, and they challenge certain of the trial court's declarations as based on improper contract interpretations. Statoil Pipelines is an appellee only, and it seeks to sustain the damages awards in its favor.

On the other side are OGE, LLC ("OGE"), Matrix Petroleum, LLC ("Matrix Petroleum"), Matrix Petroleum Holdings, LLC ("Matrix Holdings"), JAR Resources Holdings, L.P. ("JAR"), and TMRX Petroleum LLC ("TMRX" and collectively with Matrix Petroleum, Matrix Holdings, and JAR, "Matrix"[3]). OGE, Matrix Holdings, JAR, and TMRX hold the remaining leasehold working interests in the Cooke Ranch.[4] Matrix Holdings and JAR hold their interests subject to the Term Assignments. TMRX and OGE do not. Matrix's and OGE's challenges to the judgment relate principally to the damages awards against them for fees charged by Talisman and Statoil Pipelines. Among these fee disputes are disputes related to the construction and operation of a central delivery point (the "CDP"), at which hydrocarbons produced from wells on the Cooke Ranch and from wells on four other leases were commingled and then sold. Additionally, Matrix challenges several of the trial court's declarations.

Last, all appealing parties challenge aspects of the attorneys' fees awards. We decide the parties' issues by topic, beginning first with damages against Talisman related to "missing volumes" of production.

### DISCUSSION

## I. "Missing Volumes" of Production

Approximately $79 million of the money judgment against Talisman relates to "missing volumes" of production reported as being sold through the CDP. In several issues, Talisman

---

[3] The term "Matrix" includes four parties; however, we use singular verbs with Matrix when necessary to avoid awkward constructions.

[4] At one point, Matrix Petroleum held a working interest, but, by the time of trial, it had assigned its interest to Matrix Holdings and JAR.

argues that these awards for "missing volumes" must be reversed. We address only Talisman's issue on the adequacy of the pleadings and hold that Matrix and OGE did not plead "missing volumes" claims that could support the damages awards. We also hold that the parties did not try the issue by consent and that Talisman did not waive its complaint of pleading deficiency. Consequently, the judgment as to the "missing volumes" awards must be reversed, and we render a take-nothing judgment on this issue.

### A. Pleading Deficiency

#### 1. Standard of Review and Applicable Law

Rule 301 of the Texas Rules of Civil Procedure requires that the judgment of the trial court must be supported by the pleadings. TEX. R. CIV. P. 301. In Texas, pleadings must give "fair notice of the claim involved." *Id.* R. 47(a); *see also* R. 45(b). This "fair notice" pleading standard "looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000); *see also Taylor v. Taylor*, 337 S.W.3d 398, 401 (Tex. App.— Fort Worth 2011, no pet.) ("Generally, a pleading provides fair notice of a claim when an opposing attorney of reasonable competence can examine the pleadings and ascertain the nature and basic issues of the controversy and the relevant testimony."). "A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense." *Horizon/CMS Healthcare*, 34 S.W.3d at 896. "Ultimately, the purpose of pleadings is to give the adversary parties notice of each parties['] claims and defenses, as well as notice of the relief sought." *Perez v. Briercroft Serv. Corp.*, 809 S.W.2d 216, 218 (Tex. 1991). When, as here, no special exceptions are filed, we construe the pleadings liberally in favor of the pleader. *Med. Imaging Sols. Group,*

*Inc. of Tex. v. Westlake Surgical, LP*, 554 S.W.3d 152, 159 (Tex. App.—San Antonio 2018, no pet.).

### 2. Analysis

Because the "missing volumes" claims are complex, we begin our discussion with the relief awarded. *See Perez*, 809 S.W.2d at 218. We then consider the evidence and the theories Matrix and OGE use to support this relief. Last, we look at the pleadings to determine if an opposing counsel of reasonable competence could examine the pleadings and ascertain the nature and basic issues of the controversy and the testimony that would be relevant. *See Horizon/CMS Healthcare*, 34 S.W.3d at 896.

### a. The Relief Awarded

The judgment orders that Matrix obtain from Talisman: "Disgorgement of the Matrix Parties,[5] and TMRX's, net revenue interest percentage share of the net revenues from the missing volumes of production reported as being sold through the CDP from the date of first production through February 1, 2017, in the amount of $67,591,369." Likewise, the judgment provides that OGE obtain relief in the amount of $11,265,228. Matrix elected to recover its award based on its breach of contract claim, and OGE asserted its election to recover under both its breach of contract and breach of fiduciary duty claims.

### b. Matrix's and OGE's Breach of Contract Claims

On appeal, Matrix describes its disgorgement award as an "award under *Humble Oil*" and asserts that its "claim is based on *Humble Oil*." OGE argues that the award satisfies the "restitutionary formula under *Humble Oil*," which is a "specific protocol for assessing restitution."

---

[5] The trial court defined "Matrix Parties" as Matrix Petroleum, Matrix Holdings, and JAR.

Because *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812 (Tex. 1974) forms the bases of the parties' "missing volumes" claims, we consider it in detail.

### *i. Humble Oil*

*Humble Oil* concerned a contract between parties and "existing circumstances" related to an oilfield reservoir approaching depletion. *Id.* at 814. As the supreme court described, the Wests conveyed to Humble Oil fee title to certain lands but retained royalties from oil and gas "produced and saved" from the lands. *Id.* at 813. When the mineral reservoir beneath the lands approached depletion, Humble Oil concluded that the injection of extraneous gas was necessary to preserve the reservoir from destruction by water encroachment. *Id.* The Wests sued to enjoin the injection of gas into the reservoir, and alternatively, they sought declaratory judgment that Humble Oil must account to them for their royalty interest in *all* gas produced from the reservoir whether native or stored. *Id.* at 813–14.

The Texas Supreme Court concluded that the Wests were not entitled to an injunction under "the accepted principles of accommodation" between competing interests. *Id.* at 816. That, however, left the question of how to account in royalties for production from the reservoir, which after injection of non-native gas, would include both native and stored gas. *Id.* Looking first to the deed, the supreme court determined that language specifying the Wests would retain royalties from oil and gas "produced and saved" did no more than reserve the royalty interest in the native gas in the reservoir. *Id.* at 817.

This determination was contrary to the trial court's determination that Humble Oil must account to the Wests for their royalty interest in *all* gas produced from the reservoir; therefore, the supreme court next considered whether a confusion-of-goods theory could sustain the trial court's judgment. *Id.* According to the supreme court, after the injection of stored gas into the reservoir, the question became "one of determining whether Humble [Oil]'s intentional 'confusion' of the

two bodies of gas should result in the forfeiture of its exclusive rights to the extraneous gas." *Id.* at 818. The court noted the general rule that "the burden is on the one commingling the goods to properly identify the aliquot share of each owner; thus, if goods are so confused as to render the mixture incapable of proper division according to the pre-existing rights of the parties, the loss must fall on the one who occasioned the mixture." *Id.* After reviewing the evidence, the supreme court ordered a remand for further evidentiary development, stating:

> As we have indicated, it is our view that the act of commingling native and extraneous gas did not impose upon Humble [Oil] the obligation of paying royalties on all gas thereafter produced from the reservoir, if the evidence establishes with reasonable certainty the volume of gas reserves upon which the Wests would have been entitled to royalties, absent injection of extraneous gas. The burden of this showing devolves upon Humble [Oil] after proof by the Wests of their royalty interests, together with proof of Humble [Oil]'s commingling of extraneous and native gas. The threshold question for determination is whether the requisite computation of reserves is capable of establishment with reasonable certainty; and, if so, the further question to be resolved is whether the burden defined above is discharged by Humble [Oil] under the evidence.

*Id.* at 819.

### ii. Matrix and OGE's Confusion-of-Goods Theory

Matrix and OGE look to *Humble Oil* and its discussion on confusion of goods for the legal underpinnings of their "missing volumes" claims. While in *Humble Oil*, the dispute was about the initial volume of native gas in a reservoir prior to the injection of extraneous gas, here the dispute is over the total amount of oil and gas commingled at a central delivery point, the CDP. *See id.*; *see also Exxon Corp. v. West*, 543 S.W.2d 667, 674 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.) (determining on remand that successor to Humble Oil was not required to account to Wests for gas produced in excess of maximum amount of native gas, as established by expert testimony). In other words, the dispute here is about the "size of the pie," as the parties put it —

that is, the total amount of hydrocarbons comingled at the CDP. The parties contest who, under the precedent of *Humble Oil*, bore the burden of establishing this total amount commingled.[6]

In brief, this dispute over the total production commingled at the CDP arose because Talisman amended oil and gas production reports filed with the Texas Railroad Commission ("RRC"). The CDP gathers hydrocarbons produced from the Cooke Ranch and from the Reed, Hinkel, Cartwright and Belows leases. Unlike with production from the Cooke Ranch, Talisman and Statoil owned all of the royalties relating to production from the Hinkel and Reed leases. The amended RRC reports, filed between 2015 and 2017, report additional volumes of oil and gas produced from the Hinkel and Reed leases for the years 2013 and 2014. Matrix's and OGE's theory for their "missing volumes" of production claims is that Talisman, as the one commingling production at the CDP, bore the burden under *Humble Oil* to establish the working interest owners' aliquot share of hydrocarbons commingled at the CDP. Matrix and OGE argue that Talisman did not meet its burden with respect to the additional volumes of production reflected in the amended RRC reports for the Hinkel and Reed leases because Talisman did not establish a valid basis to attribute all of the additional production (the so-called "missing volumes") back to the Hinkel and Reed leases, rather than to the Cooke Ranch or to the Cartwright and Belows leases.

For its part, Talisman asserts that the amended RRC reports simply correct an earlier reporting mistake and do not reflect additional volumes of oil and gas commingled at the CDP. In other words, it asserts there are no "missing volumes," and consequently, the *Humble Oil* framework does not apply. Further, and as relevant to this analysis, Talisman argues that the pleadings did not give fair notice of Matrix's and OGE's "missing volumes" claims.

---

[6] The parties also dispute the *methodology* for allocating the commingled volume. The dispute about methodology is the basis of separate claims and monetary awards that Talisman did not appeal, as explained further below.

### iii. The Evidence

We review the evidence Matrix and OGE assert supports their claims, so we can then review the pleadings to determine if the pleadings gave fair notice of "the nature and basic issues of the controversy and what testimony [would] be relevant." *Horizon/CMS Healthcare*, 34 S.W.3d at 896. Evidence for the "missing volumes" claims consists chiefly of the voluminous RRC reports admitted into evidence and testimony by Matrix's penultimate witness at trial, David Reeves.

David Reeves was Matrix's manager of reservoir engineering. He testified about a metering problem affecting wells on the Cooke Ranch that lasted for eight months in 2013. He also testified about a dispute over the *method* for allocating the working interest owners' share of production of hydrocarbons commingled at the CDP. Reeves explained that because production from dozens of wells on five leases was collected at the CDP, a methodology had to be applied to allocate production back to each lease and each individual well. Talisman applied a volumetric allocation methodology, and Reeves opined that a flash allocation methodology was more accurate. In his export report, he calculated that $663,626 was the additional payment due to Matrix if a flash allocation methodology had been utilized instead of a volumetric allocation methodology. The jury awarded Matrix this amount in answer to a jury question on the "[a]mount[] that Talisman should have paid for production if it had used the proper allocation methodology from the first date of production through March 31, 2016." These matters regarding metering and allocation methodology were indisputably raised by the parties' pleadings and tried. The jury's resolution favored Matrix, and Talisman did not appeal the final judgment in Matrix's favor on metering and allocation methodology.

Reeves's testimony continued on several other matters until Reeves was asked whether he had an opportunity to review the RRC reports, and he affirmed he had. Reeves testified that a production report for the Hinkel lease for the month of September 2013 reported that a certain

number of barrels of oil had been sold. This report was filed with the RRC in November 2013, and the report was followed by another report for the same month but with a time stamp a minute later than the first report that listed a different number of barrels sold than the first report. This second report was followed by a third report filed another minute later with yet a different number of barrels reported as having been sold. Nearly two years later in 2015, a final amended report was filed, which reported a much higher number of barrels sold than in any of the three reports filed in November 2013. Reeves testified that this pattern of amendments in quick succession followed by a final amendment years later was consistent across RRC reports for the Hinkel and Reed leases related to production from 2013 and 2014.

Reeves testified that he reviewed the amended RRC reports after his second deposition in June 2017, which was just two months before trial. After reviewing the reports, he determined that "the size of the pie physically grew," and he calculated the value of the increased "pie," as reflected by the additional sales reported in the amended RRC reports filed from 2015 to 2017 for the Hinkel and Reed leases, to be $380,000,000. After deducting for taxes, royalty burdens, and operating expenses, the "net revenue increase" was $278,000,000, which amounted to "91 percent [of the] size of the pie for the CDP." Thus, according to Reeves, the amendments reflected that significantly more oil and gas was commingled at the CDP than previously reported. Reeves calculated that Talisman's decision to attribute all of the additional volumes of production reflected in the amended RRC reports to the Hinkel and Reed leases resulted in a "revenue loss" to Matrix of nearly $68,000,000. Reeves affirmed, when questioned by OGE's counsel, that "OGE [would] have roughly a sixth of that number."

Later at trial, Talisman called its lead production accountant, Corinne Bugamelli, to testify in an attempt to establish that the amended reports did not reflect additional production but simply corrected a mistake. The production accountant testified that the initial burst of reports filed

minutes apart was the result of human error. According to the accountant, the employee who filed the initial reports filed reports for each well on the Hinkel and Reed leases when he should have filed a single report for each lease that aggregated production from all of the wells on the lease. The result was that by the end of these initial bursts of filings, only production from one well for each lease was reported to the RRC each month. Bugamelli testified that from 2015 to 2017, Talisman filed amended reports to correct its earlier mistakes. She testified that Talisman paid royalties to Matrix and OGE based on correct, internal production data, and not based on the RRC reports.

While Bugamelli's explanation is simple, verification is more complex. Talisman did not present an expert who had reviewed all of the relevant RRC reports and compared those reports against internal production data, adjusted for any metering failures and improper allocation methodologies, or against reports filed with other regulatory agencies. To support its explanation, Talisman asks that we take judicial notice of regulatory filings it made with the Texas Comptroller for severance tax purposes. According to Talisman, filings with the Comptroller in 2013 and 2014 reflect the same volumes of oil and gas reported in the final amended RRC reports. We deny Talisman's request as moot.[7] For the reasons that follow, we hold that Matrix's and OGE's pleadings did not give fair notice to Talisman of the "missing volumes" claims or the evidence that would be relevant to give rise to such a claim.

### c. OGE's Claim for Breach of Fiduciary Duty

Before looking at the pleadings, we note OGE argues that its claim for breach of fiduciary duty also supports the disgorgement award to OGE. The jury charge instructed that Talisman

---

[7] Because we deny Talisman's request and do not rely on its filings with the Comptroller, we also deny as moot Matrix and OGE's motion to strike references in Talisman's reply brief to filings with the Comptroller and their motion to file a sur-reply addressing Talisman's arguments in its reply brief regarding filings with the Comptroller.

owed non-operator working interest owners, such as OGE, (i) a duty to account for the monies received for selling the production, (ii) a duty to avoid conflicts of interest when selling the production, and (iii) a duty not to act as an adverse party in its capacity as the seller of the production. The jury found that Talisman did not comply with all of these duties. OGE argues that a remedy for Talisman's breach of fiduciary duty is disgorgement of Talisman's "secret gain or benefit" that it wrongfully obtained as an agent for OGE. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (1942); *see In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015) ("Disgorgement is an equitable forfeiture of benefits wrongfully obtained."). OGE further argues that *Humble Oil* provides a protocol for assessing restitution.

### d. Matrix's Petition

Matrix's live pleading at the time of trial was its Ninth Amended Petition. The petition is 71 pages long, with 31 pages of factual background. The factual background begins with a history of the Cooke Ranch and continues with a section regarding "Initial Breaches" of the JOA by Talisman and Statoil. The section describes that, during or about 2010 and 2011, Talisman drilled wells on four leases adjacent to the Cooke Ranch, which included the Hinkel and Reed leases. This is the only specific mention of the Hinkel or Reed leases in the petition. Matrix further alleges in the Initial Breaches section that Talisman and Statoil unilaterally decided "to commingle the production from the leases adjacent to the Cooke Ranch with that of production on the Cooke Ranch" at the CDP. The section states that Talisman entered into right-of-way agreements for the CDP, incurred expenditures for various operations, and intended to act and did act unilaterally or in concert with Statoil only, "without compliance with the written contracts that it executed and/or assumed upon acquiring its interest in the Cooke Ranch."

The petition continues with a section on "Initial Accounting and Disclosure Issues on the Cooke Ranch," in which Matrix alleges that since October 2012, when wells began producing oil

and gas from the Cooke Ranch, Talisman and Statoil have failed to pay Matrix for its share of production in violation of the Texas Natural Resources Code. The allegation continues that Talisman and Statoil, instead, have improperly and illegally retained the proceeds of Matrix's production and,

> breached the parties' agreements by including, but not limited to, misallocation, mismetering, charging [Matrix] fees based on their working interest ownership instead of their net revenue interest ownership percentage, calculating [Matrix's] production revenue on prices less than those which [Talisman and Statoil] received[,] charging [Matrix] for expenditures not authorized by the parties' agreements, charging [Matrix] an unfair rate for the use of a pipeline gathering system and Cooke Ranch CDP, . . . failing to compensate [Matrix] for their production used to satisfy [Talisman and Statoil's] line fill requirements with third parties, failing to cure audit exceptions timely raised by [Matrix], failing to reimburse [Matrix] for credits received by the joint account from third parties, selling and failing to account and pay [Matrix] for their proportionate share of proceeds received from all production derived from the Cooke Ranch wells and failing to timely pay [Matrix] for their share of production in accordance with the prompt payment requirements of Section 91.402 of the Texas Natural Resources Code.

The petition continues with a section on "Metering Issues," in which Matrix alleges that for a period of nine months in 2013, meters for a number of Cooke Ranch wells and for off-lease wells whose production was commingled with Cooke Ranch production were not accurately recording production.

Following this section is one on "Allocation Issues." In this section, Matrix asserts that Talisman and Statoil were not using a "flash allocation methodology that both [Matrix] and Talisman agreed was necessary to properly allocate the production from the Cooke Ranch wells, after it had been comingled with off-lease production." The section explains that Talisman and Statoil applied a "volumetric allocation methodology," which may be appropriate for "dry gas" but was not appropriate for the "wet gas" found in the Eagle Ford Shale. Matrix explains further:

> 47. Talisman quickly learned that the volumetric allocation methodology it used was not accurate because the chemical compositions of the various wells feeding into the Cooke Ranch CDP were not the same because certain wells would

experience less flash [i.e., shrinkage that occurs in the collection, transportation, and processing of oil and gas] than others based on the chemical composition of the production being produced by the well. So lumping together or commingling all of the wells' production from multiple leases with different interest owners would result in some wells being paid based on a greater percentage of production volumes than the wells actually produced, while other wells were paid on amounts less than they actually produced.

48. In this particular case, there are a number of wells that feed into the CDP. Some of these wells are located on the Cooke Ranch and are owned by Talisman, Statoil and [Matrix], among others, while other wells are located on properties adjacent to the Cooke Ranch and are owned in large part solely by Talisman and Statoil. [Matrix] will show that [Talisman and Statoil's] decision to commingle the production and apply volumetric allocation to all of these wells resulted in the off-lease wells owned solely by Talisman and Statoil receiving more than their fair share of production and associated revenue and, in turn, those wells located on the Cooke Ranch, in which [Matrix] ha[s] an interest, received less than their fair share of production and associated revenue.

The section concludes:

53 . . . [Matrix] seek[s] damages incurred by the continued use of this admittedly flawed allocation methodology/model. Moreover, to the extent that Statoil received a portion of [Matrix's] production from the inception of production to present as a result of the use of flawed allocation models by Talisman and/or Statoil, [Matrix] seek[s] damages from Statoil as well.

54. In an effort to hide its misallocation from [Matrix], Talisman and Statoil routinely filed reports with the Texas Railroad Commission, which Talisman knew were false in direct violation of Texas Natural Resource Code § 91.143.

The petition continues with allegations related to various other matters. After this lengthy factual background, the petition identifies "Claims and Causes of Action." This section begins with an enumeration of Talisman's and Statoil's allegedly wrongful acts, which include:

n. Improperly commingling production from [Matrix's] Cooke Ranch wells;

. . .

p. Knowingly selling production volumes from Cooke Ranch wells belonging to [Matrix] without remitting payment to [Matrix] for their production sold;

q. Knowingly using an inaccurate, unreliable allocation methodology to apportion revenue between "on-Lease" wells, in which [Matrix] own working interests, and

"off-Lease" wells, which are owned entirely by Talisman, Statoil and other working interest owners unaffiliated with [Matrix];

. . .

nn. Co-mingling production from the Cooke Ranch with off-lease wells which resulted in [Matrix] receiving payments for less than the amount of oil and gas actually produced from the Cooke Ranch wells as a result of Talisman and Statoil's flawed volumetric allocation methodology which on information and belief is still being used to allocate production back to each well which flows through the Cooke Ranch CDP;

. . .

xx. The loss of certain volumes that were never accounted to [Matrix], such as the loss of 8,000 barrels from production in March of 2016 [TLM034846] and 30,000 barrels in 2012 & 2013 [TLM033165 & TLM033163];[8]

. . .

aaa. Filing false reports with the Texas Railroad Commission in violation of Texas Natural Resource Code §91.143[.]

The claims section then asserts a claim for breach of contract, which lists Talisman's and Statoil's breaches as including, for each, "Improperly commingling production from [Matrix's] Cooke Ranch wells." Next, a fraud claim lists Talisman's fraudulent acts as including, "Knowingly using an inaccurate, unreliable allocation methodology to apportion revenue between 'on-Lease' wells, in which [Matrix] own[s] working interests, and 'off-Lease' wells, which are owned entirely by Talisman and other working interest owners unaffiliated with [Matrix]." The claims section asserts several additional claims, drawing upon the initial list of wrongful acts, and the petition concludes with a section entitled "Request for Relief," which includes a request for "disgorgement."

---

[8] Brackets around "TLM034846" and "TLM033165 & TLM033163" are original.

*e.  Analysis as to Matrix's Petition*

Matrix describes its claim as one "under *Humble Oil*;" however, it does not specifically state a claim referencing *Humble Oil* or specifically reference "confusion of goods" or "missing volumes" of production in any claim.  *See Humble Oil*, 508 S.W.2d at 817–18.  While not dispositive on its own, the omission of a claim clearly related to a confusion-of-goods theory is notable.  The Texas Rules of Civil Procedure require a pleading to give fair notice "of the claim involved."  TEX. R. CIV. P. 47(a).  "Providing only fair notice of factual allegations does not provide fair notice of claims or causes of action asserted based on . . . alleged facts."  *Montelongo v. Abrea*, 622 S.W.3d 290, 300 (Tex. 2021).

Matrix elected to recover its disgorgement award under its breach of contract claim. Absent from this claim are allegations related to the "allocation" of commingled production.  The breach of contract claim contains a statement that Talisman breached the JOA by "[i]mproperly commingling production from [Matrix's] Cooke Ranch wells."  However, as *Humble Oil* makes clear, improper commingling is not equivalent to failing to establish aliquot shares.  *See Humble Oil*, 508 S.W.2d at 818.  In *Humble Oil*, the supreme court determined that commingling was proper, and it followed this determination with a discussion as to whether Humble Oil had established aliquot shares with reasonable certainty.  *See id.* at 816, 818.  Nowhere within Matrix's breach of contract claim is there an allegation that Talisman breached a contract with Matrix by confusing oil and gas at the CDP and by failing to establish aliquot shares with reasonable certainty.  More generally, there is no statement that Talisman breached a contract by failing to allocate royalties in accordance with contractual rights.

Matrix directs us to various allegations throughout its petition regarding allocation matters. As described above, the petition includes a factual background section on "Allocation Issues;" however, the allegations in this background section make clear that the allocation issues Matrix

complains about concern the *methodology* utilized to allocate production back to individual leases and wells after oil and gas was commingled at the CDP. According to the petition, Matrix argued that a flash allocation methodology was appropriate, and Talisman and Statoil utilized a volumetric allocation methodology. The "Allocation Issue" allegations do not concern amended RRC reports for the Hinkel and Reed leases for production from specific months in 2013 and 2014. The claims section restates the allocation issues in terms of a "flawed volumetric allocation methodology" and "unreliable allocation methodology."

Matrix also points to a statement that Talisman and Statoil "routinely filed reports with the Texas Railroad Commission, which Talisman knew were false." This statement appears within the "Allocation Issues" section. In its context, an opposing attorney of reasonable competence would read the statement as alleging that Talisman and Statoil filed false RRC reports because each reported production numbers based on a flawed, volumetric allocation methodology.

Relatedly, Matrix directs us to an enumerated wrongful act, described as:

xx. The loss of certain volumes that were never accounted to [Matrix], such as the loss of 8,000 barrels from production in March of 2016 [TLM034846] and 30,000 barrels in 2012 & 2013 [TLM033165 & TLM033163][.]

This allegation first appeared in an amended petition, and it references documents Talisman produced in discovery. The March 2016, 8,000-barrel reference is related to Matrix's claim that Talisman underpaid Matrix as shown by discrepancies between production reported on a Production Volume Reporting system ("PVR") and marketed volumes. A Matrix expert witness produced a report shortly after Matrix's Seventh Amended Petition was filed that explains this alleged discrepancy and cites to TLM034846. Ultimately, the jury determined a question related to this alleged discrepancy against Matrix. The reference to "30,000 barrels in 2012 & 2013" was

never discussed at trial.[9]  An opposing attorney of reasonable competence would not read Matrix's isolated allegation about "[t]he loss of certain volumes" in 2012, 2013, and 2016 and understand that it could implicate production from the Hinkel and Reed leases in 2013 and 2014.  The specific examples in the petition do not implicate a confusion-of-goods claim based on amended RRC reports from off-lease wells, and an opposing attorney of reasonable competence would not ascertain a "missing volumes" claim from Matrix's examples in its pleading.

Likewise, Matrix's general request for "disgorgement" in its "Request for Relief" refers to and is controlled by the preceding specific allegations and does not raise a new claim or theory that the preceding allegations had not.  *See Heritage Gulf Coast Props.*, 416 S.W.3d at 660; *cf. Monsanto Co. v. Milam*, 494 S.W.2d 534, 536 (Tex. 1973) ("The specific allegation controls over the general allegation.").  Here, the theory for Matrix's claims, as stated repeatedly in its petition, was that Talisman employed a flawed allocation *methodology*; this theory does not concern missing volumes of production related to wells that are not on the Cooke Ranch, and the petition does not give fair notice of a separate claim for "missing volumes of production."[10]

Moreover, this is not a case in which the discovery process revealed that the parties understood that a "missing volumes" claim would be tried.  *Cf. Hammer v. Dall. Transit Co.*, 400 S.W.2d 885, 889 (Tex. 1966) (noting that discovery admission suggested defendant knew plaintiff

---

[9] An expert report from a Matrix witness indicates that TLM033165 & TLM033163 show production from the Cooke Ranch.

[10] We held similarly in *The Huff Energy Fund, L.P. v. Longview Energy Co.*  A majority of this court determined that references to "competition" in a petition were made in connection with a claim for breach of fiduciary duty by usurpation of a corporate opportunity and that the petition did not give fair notice of a separate claim for breach of fiduciary duty by engaging in competition with the corporation.  *See* 482 S.W.3d 184, 197–98 (Tex. App.—San Antonio 2015) (en banc), *aff'd sub nom. Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866 (Tex. 2017); *see also id.* at 199 (Barnard, J., concurring in analysis).  We rejected the plaintiff's argument that a competition claim was raised based on isolated references to competition because the "theme" that was carried through the petition was one of "appropriating an opportunity."  *Id.* at 195, 197; c*f. Heritage Gulf Coast Props., Ltd. v. Sandalwood Apartments, Inc.*, 416 S.W.3d 642, 658–62 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (holding request for attorney's fees in pleading gave fair notice that recovery was based on specific theories listed and did not give fair notice that recovery was also sought under theory omitted from list).

was relying on allegation of negligence stated in factual background of petition but not restated in claims section). Reeves's expert report filed in March 2017 does not discuss a "missing volumes" claim. He affirmed at his second deposition, in June 2017, that he did not anticipate providing expertise on claims other than those discussed; a "missing volumes" claim was not discussed. In September 2017, Reeves testified at trial that he reviewed the RRC reports related to the Hinkel and Reed leases and developed the theory for the "missing volumes" claim earlier that summer.

This timeline shows that Reeves did not develop his theory for the "missing volumes" claim until after Matrix filed its Eighth Amended Petition in May 2017. While not the live pleading, the Eighth Amended Petition includes all of the allegations that Matrix directs us to on appeal concerning its live Ninth Amended Petition. We cannot say that a reasonably competent opposing counsel would have ascertained from allegations made in the Eighth Amended Petition, and carried over into the Ninth Amended Petition, a theory or claim for "missing volumes" that Matrix had not yet developed when Matrix first stated the relevant allegations.

In short, we must read a petition in its entirety and construe facts alleged in conjunction with the claims expressly pled. *See Huff Energy Fund*, 482 S.W.3d at 197–98. In doing so, we cannot reasonably infer that Matrix's live petition contains a "missing volumes" claim, and, therefore, even under a liberal construction, we must conclude that the petition does not. *See id.* at 198. Because a "missing volumes" claim cannot be reasonably inferred, Talisman had no obligation to file special exceptions. *See id.*; *Heritage Gulf Coast Props.*, 416 S.W.3d at 662; *Roberts v. Sw. Tex. Methodist Hosp.*, 811 S.W.2d 141, 145 (Tex. App.—San Antonio 1991, writ denied) ("One who is sued on two specific theories of recovery has no duty to except to the petition and ask whether there are other theories that the pleader wants to allege.").

"A trial court may not enter judgment on a claim that was not sufficiently pled or otherwise tried by consent." *JPMorgan Chase Bank, N.A. v. Prof'l Pharmacy II*, 508 S.W.3d 391, 420 (Tex.

App.—Fort Worth 2014, no pet.) (citing TEX. R. CIV. P. 67, 301; *Stoner v. Thompson*, 578 S.W.2d 679, 682–83 (Tex. 1979)).  We hold the "missing volumes" claim was not sufficiently pled in Matrix's live Ninth Amended Petition.  Before rendering a take-nothing judgment on this claim, we first consider OGE's petition, and then we consider Matrix's argument that its "missing volumes" claim was tried by consent.

### *f.  OGE's Petition and Analysis*

As with Matrix's petition, OGE's live petition, its Third Amended Original Petition in Intervention, does not mention *Humble Oil* or confusion of goods.  The petition describes the CDP as a processing facility at which Talisman commingled production from wells on the Cooke Ranch with production from "off-Lease" wells, but it does not mention the Hinkel and Reed leases by name.  OGE alleges, as does Matrix, that Talisman "improperly commingled production" from the Cooke Ranch wells through the CDP.  The only statement in the petition regarding allocation is that Talisman engaged in willful misconduct by:

> Using inaccurate, unreliable allocation *methodology* to apportion revenue between on-Lease wells in which OGE owns working interest and off-Lease wells which are owned entirely by Talisman and other working interest owners unaffiliated with OGE[.]

(Emphasis added.)

We hold, as with Matrix's petition, that allegations regarding "improper commingling" and "unreliable allocation methodology" do not give fair notice of a "missing volumes" claim related to amended RRC reports for the Hinkle and Reed leases.  An opposing counsel of reasonable competence would not ascertain from OGE's pleadings an allocation dispute related to amended RRC reports; an opposing counsel of reasonable competence would ascertain only an allocation dispute regarding the methodology for allocating commingled production.

We acknowledge that OGE alleged that Talisman owed it a fiduciary duty, which included accounting for profits, and that OGE pled for disgorgement; however, its general allegations regarding fiduciary duty and its request for disgorgement are controlled by the specific allegations about improper commingling and an unreliable allocation methodology. *See Monsanto*, 494 S.W.2d at 536. These specific allegations do not give fair notice of an allocation dispute related to production reflected in amended RRC reports for off-Lease wells. *See Huff Energy*, 482 S.W.3d at 198; *Heritage Gulf Coast Props.*, 416 S.W.3d at 660; *cf. Monsanto*, 494 S.W.2d at 536. OGE did not plead facts that apprised Talisman of the nature and basic issues of the "missing volumes" controversy or the testimony that would be relevant under either its breach of contract claim or its breach of fiduciary duty claim. *See Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 896.[11]

As with Matrix, OGE argues that the "missing volumes" claim was nevertheless tried by consent.

### B. Trial by Consent

#### 1. Standard of Review and Applicable Law

Issues not raised by the pleadings may be tried by express or implied consent of the parties and treated as if they had been raised in the pleadings. TEX. R. CIV. P. 67. Trial by consent applies only when it appears from the record that the issue was actually tried. *Med. Imaging*, 554 S.W.3d at 160. To make this determination, the trial court must review the record not for evidence of the issue, but rather for evidence of *trial* of the issue. *Id.* The doctrine of trial by consent is only intended to cover the exceptional case in which it clearly appears from the record as a whole that

---

[11] We deny as moot Talisman's request to supplement its opening brief with a sentence to clarify that it challenges the disgorgement award under both a contract basis and a breach of fiduciary duty basis. Since its opening brief, Talisman has maintained that OGE did not plead a "missing volumes" claim. This argument necessarily encompasses the argument that OGE's pleading as to its breach of fiduciary duty claim does not raise a "missing volumes" claim. Because we hold that Talisman has challenged all bases for the disgorgement award, we reject OGE's argument that Talisman waived the right to challenge the award by failing to specifically challenge a breach of fiduciary duty basis for the award.

the parties tried the unpleaded issue, and it is not intended to establish a general rule of practice. *Kebodeaux v. Kebodeaux*, No. 04-20-00147-CV, 2021 WL 3639814, at *3 (Tex. App.—San Antonio Aug. 18, 2021, no pet.) (mem. op.). Consent may be found only where evidence regarding the unpleaded issue is developed under circumstances indicating that both parties understood the issue was in the case, and the other party failed to make an appropriate complaint. *Id.* A trial court has broad discretion in determining whether an unpleaded issue was tried by consent. *Id.* However, it abuses its discretion if it acts arbitrarily or in an unreasonable manner without reference to any guiding rules or principles. *Id.* Although "discretion is to be exercised liberally in favor of justice, trial by consent is the exception, not the rule, and should not be inferred in doubtful cases." *Id.*

### 2. Analysis

In their opening briefs, Matrix and OGE argue that Talisman waived objections to Reeves's testimony by failing to object when the need became apparent. However, this argument conflates admission of testimony with trial by consent. Trial by consent occurs "[w]hen both parties present evidence on an issue and the issue is developed during trial without objection." *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *see* TEX. R. CIV. P. 67. An objection to prevent trial by consent can occur as late as the charge conference. *See Huff Energy*, 482 S.W.3d at 194–95 (holding no trial by consent where appellants objected to submission of jury question on the basis that an issue was not pled). The supreme court has explained: "[A]lthough the complaining party does not object to the testimony on the issues but does object to their submission on some tenable ground, he cannot be regarded as impliedly consenting that they be tried when not raised by the pleadings, as contemplated by Rule 67." *Harkey v. Tex. Emps.' Ins. Ass'n*, 208 S.W.2d 919, 922 (1948).[12]

---

[12] Rule 67 provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." TEX. R. CIV. P. 67.

Here, Talisman objected much earlier than the charge conference. Midway through Reeves's testimony and prior to admission of an exhibit showing his calculations, Talisman's counsel objected, stating: "Your Honor, this is a claim for damages that's not in their pleadings and it's not designated at all." The parties argued the matter at length, and Talisman moved for a mistrial on the matter. The trial court denied the motion. Reeves continued his testimony, and the trial court admitted the exhibit showing Reeves's calculations.

Although Talisman presented rebuttal witnesses after its objection was overruled, it did not try the issue by consent. *See Green Tree Servicing, LLC v. Sanders*, No. 04-13-00156-CV, 2014 WL 2443811, at *5 (Tex. App.—San Antonio May 28, 2014, no pet.) (mem. op.) ("There is no trial by consent where a party objects to the introduction of evidence."); *Sorrell v. Elsey*, 748 S.W.2d 584, 589 (Tex. App.—San Antonio 1988, writ denied). The cases Matrix and OGE rely on to suggest that consent occurs when a party offers evidence on an issue are distinguished by the fact that in each of those cases, there was no objection to trial on the issue. *See Ingram*, 288 S.W.3d at 893; *Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied). Here, in contrast, Talisman objected, and the trial court overruled the objection. Only then did Talisman offer evidence in its defense.

Because Matrix and OGE did not plead "missing volumes" claims to support the disgorgement awards and the issue was not tried by consent, we hold the trial court erred by entering the awards. Therefore, we reverse the judgment as to these awards and render judgment that Matrix and Talisman take nothing on their "missing volumes" claims.

## II. Jurisdiction over Statoil Texas's Appeal

Besides the "missing volumes" awards, Talisman appeals awards and declarations related to specific provisions in the JOA and Term Assignments. Statoil Texas challenges many of the same declarations, and it challenges the failure of the trial court to declare other matters in its favor

and the trial court's failure to award it damages.[13]  Matrix and OGE filed motions to dismiss Statoil Texas's appeal for lack of jurisdiction.  They contend that Statoil Texas does not have standing and that its appeal is moot.  In light of these challenges, we consider our jurisdiction over Statoil Texas's appeal.[14]

### A.  Background

In 2010, Talisman and Statoil Texas received their leasehold interests in the Cooke Ranch. By the time of trial, Talisman and Statoil Texas together owned approximately 63% of the leasehold working interests.[15]  After trial, Statoil Texas sold its entire leasehold working interest to Talisman.

In addition, all working interest owners in the Cooke Ranch hold their interests subject to the terms of the JOA.  The JOA provides for an "Operator" who, "subject to the terms and provisions of [the JOA], [shall] have exclusive, full and complete management and control of the exploration, development and operation of the leased acreage for the production of oil and gas." At all relevant times prior to entry of the final judgment, Talisman was the Operator and Statoil Texas was its "contract operator," to whom Talisman had delegated its duties as Operator.[16]  Statoil Texas acknowledges in briefing that it is no longer the contract operator.

---

[13] Talisman joins in Statoil Texas's challenges to the declarations, *see* TEX. R. APP. P. 9.7, but there remain some matters, such as the trial court's failure to award Statoil Texas damages, that Statoil Texas alone pursues.

[14] The parties have extensively briefed the issue of jurisdiction.  We carried with the appeal a motion by Statoil Texas to file sur-responses to Matrix's and OGE's motions to dismiss.  We grant Statoil Texas's motion, and we refuse Matrix's and OGE's requests (conditioned on our granting Statoil Texas's motion) to file further briefing on the issue.

[15] Talisman and Statoil Texas initially held this interest in equal shares, but, by the time of trial, Talisman had assigned to Statoil Texas a portion of Talisman's working interest.  Statoil Texas represents that it owned approximately 39% of the working interest in the Cooke Ranch at the time of trial.

[16] Although Talisman was never formally elected as Operator, at trial, all parties acknowledged that Talisman was the Operator.  Prior to entry of the final judgment, however, Statoil requested a declaration that "in the absence of an Operator, the 1954 JOA is an unenforceable contract."  The trial court denied the declaration, and Statoil has not appealed this denial.  In briefing, Statoil Texas asserts: "The apparent disagreement over whether Talisman was truly and legally the capital 'O' Operator is a tempest in a teapot. . . .  All parties proceeded as though Talisman had the operating rights under the 1954 JOA."  We proceed the same way.

Based on these post-judgment developments, Matrix and OGE argue that Statoil Texas has no standing to bring its appeal and that its appeal is moot.

### B. Standard of Review and Applicable Law

A party may move to dismiss all or some part of an appellant's appeal. *See* TEX. R. APP. P. 42.3; *Williams v. Lara*, 52 S.W.3d 171, 184, 194–95 (Tex. 2001) (dismissing certain claims for lack of jurisdiction). To determine its jurisdiction, an appellate court may consider documents submitted by the parties that are outside of the court's record. *See* TEX. GOV'T CODE ANN. § 22.220(c); *Sabine Offshore Serv., Inc. v. City of Port Arthur*, 595 S.W.2d 840, 841 (Tex. 1979); *Burgess v. State*, 313 S.W.3d 844, 848 n.5 (Tex. App.—Fort Worth 2010, no pet.).

Subject matter jurisdiction is essential to the authority of a court to decide a case, and standing is implicit in the concept of subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Standing cannot be waived and may be raised for the first time on appeal. *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018). "For standing, a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized, actual or imminent, not hypothetical." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008) (citations omitted). "A plaintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress." *Id.* at 305. When, as here, a plaintiff seeks a judicial declaration, standing limits subject matter jurisdiction to cases "involving a distinct injury to the plaintiff . . . and a real controversy between the parties, which will be actually determined by the judicial declaration sought." *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) (citation and ellipses omitted).

"For a plaintiff to have standing, a controversy must exist between the parties at every stage of the legal proceedings, including the appeal." *Williams*, 52 S.W.3d at 184. If a controversy

ceases to exist because the parties lack a legally cognizable interest in the outcome, the case becomes moot. *Id.* "An appeal is moot when a court's action on the merits cannot affect the rights of the parties." *Zipp v. Wuemling*, 218 S.W.3d 71, 73 (Tex. 2007).

### *C. Analysis*

Statoil Texas's appeal is comprised of eight issues. The issues primarily concern contract interpretation of the JOA and Term Assignments. Issue 1, part of Issue 2, and Issue 5 challenge declarations the trial court made. The other part of Issue 2, and Issues 3, 6, and 7 challenge the trial court's failure to make additional declarations.[17] Issue 4 is a challenge that the trial court erred by failing to award Statoil Texas damages against Matrix Holdings and JAR. Issue 8 is a challenge that the trial court erred by awarding any declaratory relief to OGE against Statoil Texas because OGE did not sue Statoil Texas. We analyze our jurisdiction by the issues.

#### 1. Issue 4

By its fourth issue, Statoil Texas challenges the trial court's failure to award it damages in the amount of $131,963.89 against Matrix Holdings and $2,280,424.59 against JAR "for their share of the drilling and completion costs of the October 2016 Wells." As discussed in greater detail below, the October 2016 Wells are three wells that Statoil Texas drilled as the contract operator on behalf of Talisman, the Operator. Statoil Texas also represents that it drilled nine additional wells after the trial court entered its final judgment — three wells each in 2018, 2019, and 2020.

By its Issue 4, Statoil Texas seeks to recover specific costs already expended related to the three wells drilled in October 2016. Matrix argues that Statoil Texas has no standing to seek this

---

[17] We note that Issue 3 concerns the trial court's failure to declare a matter because the "parties have not joined issue on the question." Although Statoil Texas frames its issue in terms of a matter declared, the dispute is one over a matter the trial court did not declare. The judgment specifies that Statoil's requested declaration is "Not Declared."

recovery because, under the JOA, only Talisman, as the Operator, had the right to bill and charge non-operating working interest owners. OGE asserts a similar argument that "[b]ecause Statoil [Texas] is not and has never been the Operator of the Cooke Ranch, it lacks standing."[18]

In their arguments, the parties direct us to a Contract Operating Agreement ("COA"), entered into by Statoil Texas and Talisman only. The COA became effective on April 1, 2016. Under the COA, Talisman remained the Operator under the JOA, and Statoil Texas became its "contract-operator" to "perform the services and carry out all the duties to be performed by Talisman as operator under the 1954 JOA." The COA further provides:

> Statoil [Texas] shall be entitled to reimbursement from Talisman for all costs and expenditures incurred by Statoil [Texas] in its performance of the Services to the extent the same are properly incurred and authorized under the 1954 JOA in a manner such that the operator is in turn authorized and able to recover the same from the joint interest owners under the 1954 JOA. As consideration for the performance of the Services, Statoil [Texas] shall be entitled to all overhead actually payable to the operator under the 1954 JOA for those periods of time in which it is acting as contract-operator hereunder, in accordance with the accounting procedure attached to the 1954 JOA as if Statoil [Texas] had performed such Services as the operator under the 1954 JOA, provided that if any portion of the overhead is not collected from any joint interest owner other than Talisman, Talisman will not be obligated to pay such uncollected portion to Statoil [Texas] but will, at Statoil [Texas]'s election and to the extent legally possible, assign the claim to Statoil [Texas] for collection. Talisman, in its capacity as the operator under the 1954 JOA, will charge each non-operator party under the 1954 JOA for such non-operator's proportionate share of such costs and expenditures and overhead, provided that Statoil [Texas], on behalf of Talisman, will send the bills for such charges to each non-operator party and collect the payments due.

With its Issue 4, Statoil Texas seeks to recover costs it is owed pursuant to the COA and JOA for wells drilled while Statoil Texas was the contract operator. Statoil Texas asserts an issue based on specific amounts of money allegedly owed to it; therefore, its grievance is personal and concrete. *See DaimlerChrysler*, 252 S.W.3d at 304–05.

---

[18] Although OGE's argument addresses declarations and not damages awards, we consider it here because it dovetails with Matrix's argument that Statoil Texas does not have standing because it was not the Operator.

Nevertheless, OGE argues that Statoil Texas does not have standing because OGE is not a party to the COA and because the JOA and the trial court's declarations interpreting the JOA concern only Talisman's authority, as Operator. In its reply, Matrix compares the relationship between Talisman, as Operator, and Statoil Texas, as contract operator, to that of a general contractor to a subcontractor. According to Matrix, a subcontractor can make no claim against an owner and must look to the general contractor for payment. Under this analogy, Matrix argues that Statoil Texas cannot look to payment from the working interest owners and must look only to Talisman, the Operator.

We disagree with OGE that only Talisman, as Operator, has standing to appeal, and we disagree with Matrix that the law as to delegation of duties and assignments of claims is so constrained as to prohibit Talisman's contract operator, Statoil Texas, from seeking recovery for costs allegedly owed to it. "As a general rule, all contractual duties are delegable." *OBO, Inc. v. Apache Corp.*, 566 S.W.3d 26, 31 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 596 (Tex. 1992) and Restatement (Second) of Contracts § 318 (1981)). "Absent specific circumstances . . . , causes of action in Texas are freely assignable." *City of San Antonio v. Valemas, Inc.*, No. 04-11-00768-CV, 2012 WL 2126932, at *8 (Tex. App.—San Antonio June 13, 2012, no pet.) (mem. op.) (citing *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 705–07 (Tex. 1996)). Under these principles, courts have determined that an assignee of claims has standing to sue upon the assigned claims. *See e.g.*, *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 293 (Tex. App.—Dallas 2009, no pet.) (assignment of claims through bankruptcy); *All Metals Fabricating, Inc. v. Ramer Concrete, Inc.*, 338 S.W.3d 557, 562 (Tex. App.—El Paso 2009, no pet.) (assignment of claims held by a property owner).

We see no reason to curtail this generally allowed delegation of duties and assignment of claims, which is expressly provided for in the COA. The COA provides that Talisman "will, at Statoil [Texas]'s election and to the extent legally possible, assign the claim to Statoil [Texas] for collection." The case Matrix cites in the contractor/subcontractor context is inapposite because, in that case, there was no agreement comparable to the COA. *See City of LaPorte v. Taylor*, 836 S.W.2d 829, 831–32 (Tex. App.—Houston [1st Dist.] 1992, no writ); *see also OBO*, 566 S.W.3d at 30–33 (holding Apache Corporation, an entity that performed "operator services" for a "Unit Operator" pursuant to contract, acted on behalf of Unit Operator when it prosecuted lawsuit against working interest owners).

We hold that Statoil Texas has standing to pursue an appeal as to its Issue 4.

### 2. Issues 1, 2, 3, 5, 6, and 7

Issues 1, 2, 3, 5, 6, and 7 concern declarations, rather than damages. "A declaratory judgment, by its nature, is forward looking; it is designed to resolve a controversy and prevent future damages. It affects a party's behavior or alters the parties' legal relationship on a going-forward basis." *Intercontinental Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 660 (Tex. 2009) (citation omitted). Matrix and OGE argue that Statoil Texas, having sold its working interest and resigned as contract operator, has no standing and that its appeal is moot as to these forward-looking declarations. Statoil Texas responds that the declarations affect its right to recover costs incurred during the timeframe between entry of the final judgment and termination of its working interest and its role as contract operator. Specifically, it asserts that the declarations impact its rights to recover costs related to wells it drilled while contract operator in 2016, 2018, 2019, and 2020, periods which are now, no longer, forward looking.

We hold that Statoil Texas has a legally cognizable interest in the outcome of its Issue 1, the part of Issue 2 concerning construction of the Term Assignments with the JOA, and Issues 6

and 7. *See Williams*, 52 S.W.3d at 184. Each of these issues concern Statoil Texas's costs to drill wells, for which recovery is disputed, and Statoil Texas retained "all rights, claims and causes of action . . . with respect to [the instant case]" when it sold its interests in the Cooke Ranch to Talisman. *See AMI Ass'n Mgmt., Inc. v. Sprecher*, No. 01-15-00791-CV, 2017 WL 3526762, at *4 (Tex. App.—Houston [1st Dist.], Aug. 17, 2017, no pet.) (mem. op.) (holding former condominium owners retained standing after sale because former owners had not obtained relief for alleged injuries that occurred during their period of ownership).

However, Statoil Texas does not have a legally cognizable interest in the outcome of its Issue 3 and the part of Issue 2 that concerns the trial court's failure to declare that the Term Assignments "obligated the Term Assignment Assignees to each other to drill three wells per year." Statoil Texas's Issue 3 is a challenge to the trial court's failure to make this declaration because the trial court determined that the parties "have not joined issue on the question." The Term Assignments are discussed in greater detail below. For purposes of standing, it is enough to note that the record and Statoil Texas's representations provide that Statoil Texas drilled three wells per year while it retained a working interest in the Cooke Ranch as a "Term Assignment Assignee." Thus, the obligation in the Term Assignments to drill three wells per year was satisfied for those years, and there is no unresolved controversy that could be resolved by the requested declaration as to those years. Because Statoil Texas is not a Term Assignment Assignee after the sale of its interest in the Cooke Ranch, it has no standing on appeal to challenge the trial court's failure to render a forward-looking declaration as to the Term Assignment Assignees' rights and obligations to drill wells in future years to meet any three-well-per-year obligation. *See Williams*, 52 S.W.3d at 184.[19] Accordingly, we dismiss Statoil Texas's appeal as to its Issue 3 and the part

---

[19] Talisman does not join in Statoil Texas's issues regarding the trial court's *failure* to declare any matter; Talisman's challenges concern only declarations made.

of Issue 2 that concerns the purported three-well-per-year drilling obligation in the Term Assignments.

Statoil Texas also does not have a legally cognizable interest in the outcome of its Issue 5. Issue 5 concerns the trial court's declaration that the Operator must ensure there are "sufficient facilities" to allow a working interest owner to take production in kind. Statoil Texas acknowledges:

> [It] will not be impacted as to future wells. But as to the twelve existing wells [drilled between 2016 and 2020], if the declaration is sustained, it will create a claim that Statoil [Texas] failed to implement the declaration while it was the operator, which Matrix may seek to enforce as an action for damages.

Matrix, however, has not indicated an intent to pursue such a claim. With only this hypothetical dispute, Statoil Texas lacks standing. *See DaimlerChrysler*, 252 S.W.3d at 304–05. Consequently, we dismiss Statoil Texas's appeal as to its Issue 5 for want of jurisdiction. *See* TEX. R. APP. P. 42.3; *Williams*, 52 S.W.3d at 184, 194–95. Nevertheless, we consider the matter of "sufficient facilities" because Talisman joined in Statoil Texas's challenge to the trial court's declaration, and Talisman's standing, as Operator, is unchallenged. *See* TEX. R. APP. P. 9.7.

### 3. Issue 8

Statoil Texas's eighth issue challenges the trial court's award of any declaratory relief to OGE against Statoil Texas based on the ground that OGE did not sue Statoil Texas. OGE responds that no reasonable construction of the judgment suggests that OGE obtained any relief against Statoil Texas and its argument is "simply misdirection." Further it asserts: "OGE agrees that it did not sue Statoil-Texas and so is not entitled to recover against Statoil-Texas."

Statoil Texas has directed us to only one declaration in OGE's favor obtained against it.[20] This declaration concerns the October 2016 Wells, and it was declared in an interlocutory judgment, which was incorporated into the final judgment. For the reasons given above, Statoil Texas has standing to challenge declarations regarding the October 2016 Wells, and we consider those declarations below.[21] Statoil Texas has not directed us to any other declarations in OGE's favor against it. Instead, all other declarations Statoil Texas references in its appellate brief apply against the "Operator," which is Talisman, or to working interest owners in the Cooke Ranch, which group does not include Statoil Texas after the sale of its interest. Moreover, Statoil Texas is no longer the contract operator. Statoil Texas has not explained how OGE could enforce any of the additional declarations in OGE's favor against Statoil Texas, and OGE has asserted no entitlement to recovery against Statoil Texas. Therefore, we hold Statoil Texas has not established an actual or imminent injury as to these additional declarations, and we dismiss Statoil Texas's appeal as to its Issue 8, except to the extent Issue 8 challenges declarations in OGE's favor regarding the October 2016 Wells. *See DaimlerChrysler*, 252 S.W.3d at 304–05.

## III. JOA Section 8

Having determined our jurisdiction, we turn to the remaining disputes. These disputes, in large part, concern contract interpretations of the JOA and Term Assignments. We begin by interpreting JOA Section 8, considering any impact the Term Assignments may have on our interpretation. We then consider the trial court's challenged awards and declarations as to Section 8.

---

[20] The declaration provides: "[I]f Statoil [defined to include Statoil Texas] and/or Talisman Energy USA Inc. proceed in the drilling of the Proposed [October 2016] Wells without the unanimous consent of the working interest owners, it/they will be in breach of the JOA."

[21] Because we sustain Statoil Texas's Issue 1 as to the October 2016 Wells, we ultimately do not reach Statoil Texas's Issue 8.

### A.  Background

In 1954, Paul Kayser and Plymouth Oil Company ("Plymouth") executed the JOA.  The JOA originally designated Kayser as "Operator" and Plymouth as "Non-operator."  After various assignments, Talisman, Statoil Texas, Matrix Holdings, JAR, TMRX, and OGE came to be the only working interest owners in the Cooke Ranch.  All of these parties' interests were subject to the JOA, and at all relevant times, the parties considered Talisman to be the Operator and Statoil Texas, Matrix Holdings, JAR, TMRX, and OGE to be non-operators.[22]

Matrix Holdings, JAR, Talisman, and Statoil Texas derived their holdings pursuant to a series of assignments of oil and gas leases, the Term Assignments, entered into by these parties or their predecessors in 2010.  Consequently, the working interests of Matrix Holdings, JAR, Talisman, and Statoil Texas are subject to the Term Assignments; the working interests of TMRX and OGE are not.[23]  The Term Assignments require the term assignees to drill a well on the Cooke Ranch during the primary term, which has now expired.  The Term Assignments further provided that they can be maintained in force after the primary term ends if additional wells are drilled:

> After the Primary Term, Assignees shall commence, or cause to be commenced, actual drilling operations on Eagle Ford Wells on the Land at the rate of at least **three (3)** new Eagle Ford Wells per year.  Assignees shall be in compliance with this three-well obligation if, on or before each annual anniversary date of the expiration of the Primary Term, the cumulative number of Eagle Ford Wells on which Assignees have commenced, caused to be commenced, or participated in actual drilling operations after expiration of the Primary Term in compliance with

---

[22] Talisman delegated some of its duties as Operator to Statoil Texas, but that delegation did not alter Statoil Texas's status as a non-operator in its own right.

[23] To facilitate understanding, this table displays which parties are subject to which agreements:

| Party | Subject to JOA | Subject to Term Assignments |
|-------|----------------|------------------------------|
| Talisman | Yes, Operator | Yes |
| Statoil Texas | Yes | Yes |
| Matrix Holdings | Yes | Yes |
| JAR | Yes | Yes |
| TMRX | Yes | No |
| OGE | Yes | No |

this Assignment is at least three times the number of anniversary dates that have followed the expiration of the Primary Term.

Talisman and Statoil Texas argue that this clause impacts whether Matrix Holdings and JAR can withhold consent to drill wells.

Prior to commencement of this litigation, Talisman drilled 13 wells on the Cooke Ranch, and it drilled three more wells, the October 2016 Wells, a year before trial. Matrix Holdings, JAR, TMRX, and OGE attempted to withhold consent to the drilling of the October 2016 Wells. After trial, Talisman, through its contract operator Statoil Texas, drilled 12 additional wells.

The parties' disputes regarding JOA Section 8, in general, concern how the parties share costs and revenues related to the October 2016 Wells and any future wells. Section 8 concerns consent to drill as well as cost and revenue sharing absent consent. Section 8 provides in full:

> Except as is otherwise provided in the preceding Section 7 or in this Section 8, no well shall be drilled on the leased acreage in search of oil or gas unless all parties hereto consent to the drilling of such well; provided, however, that neither the provisions of said Section 7 nor this Section 8 shall operate to relieve either party hereto from the obligations of reasonable development of the leased acreage for oil and gas or the obligation to prevent drainage of oil and gas from the leased acreage imposed by the jointly owned leases, as certain of such leases are modified by this agreement. In the event the parties hereto cannot agree upon the drilling of any well for oil or gas, which well is not covered by the provisions of the preceding Section 7, then the party desiring to drill such well shall give the other party written notice of such desire, specifying the location, proposed depth and estimated cost of such well. The other party shall have thirty days after receipt of such notice within which to notify the party desiring that such well be drilled whether or not he or it elects to participate in the cost of drilling such well at such location. Failure to give such notice within such period of thirty days shall be construed as an election by said other party not to participate in the cost of drilling such well at such location. Any well drilled under the provisions of this section shall be drilled at the sole cost, risk and expense of the party electing to drill. If any party shall elect not to participate in the drilling of such well at such location, then within thirty days after the expiration of said period of thirty days, the party desiring to drill shall commence operations for the drilling of such well at such location, and thereafter complete such well with due diligence in order to be entitled to the benefits of this section. If any such well shall be a producer of oil or gas in paying quantities, the party drilling such well shall own the same and all of the working interest oil and gas produced from such well until he or it shall receive out of the value of such production an amount (after first deducting operating expenses) equal to 200% of

the cost of drilling, testing, completing and equipping such well. Thereafter, all expenses of operating such well shall be borne by the parties hereto in the proportions as specified in Section 4 hereof and such well and its equipment and the production from such well shall be owned by the parties hereto in the proportions as stated in Section 2 hereof.

### 1. The Trial Court's Interpretations

The trial court made numerous declarations interpreting Section 8 and specifying cost and revenue sharing based on the JOA and Term Assignments. The trial court also ordered that OGE recover from Talisman $122,681 as OGE's share of production from the October 2016 Wells.

The trial court declared as to Section 8:

> The JOA provides that no new well may be drilled without the consent of all members of the JOA, unless the members are obliged to drill it, under obligations in the underlying leases, to prevent drainage, and/or to reasonably develop.

Through this declaration, the trial court determined that Section 8 permitted three and only three exceptions to the requirement of unanimous consent to drill: obligations in the underlying leases, to prevent drainage, and/or to reasonably develop. The trial court also declared, as to the October 2016 Wells, that there had not been unanimous consent to drill and that none of the three exceptions applied.

Nevertheless, Talisman, as Operator, and Statoil Texas, as Talisman's contract operator, had drilled the October 2016 Wells. In light of this reality, the trial court provided definitions in its judgment and made several declarations to establish the parties' rights regarding wells drilled without consent and when consent was disputed. In the final judgment, the trial court defined "Participating member," "Nonparticipating member," and "Nonconsenting member" as follows:

> "Participating member" refers to the status of a party to the JOA, when that party has, with regard to a particular well, both consented to the drilling of the well, and elected to participate in the drilling of the well.

> "Nonparticipating member" refers to the status of a party to the JOA, when that party has, with regard to a particular well, consented to the drilling of the well, but not has [*sic*] elected to participate in the drilling of the well.

> "Nonconsenting member" refers to the status of a party to the JOA, when that party has, with regard to a particular well, not consented to the drilling of the well, and has not elected to participate in the drilling of the well.

The trial court declared that the parties to the Term Assignments (i.e., Talisman, Matrix Holdings, and JAR) "have consented, among themselves for purposes of JOA § 8, to the drilling of the minimum number of [wells]" required to keep the Term Assignments in force. Based on this "consent" given only through the Term Assignments, the trial court declared that Matrix Holdings and JAR are "nonparticipating members" as to the October 2016 Wells. The trial court declared that the JOA awards participating members the production of nonparticipating members until the participating members have received, after operating expenses, 200% of the costs to drill a well.

The trial court also declared TMRX and OGE (i.e., the parties not subject to the Term Assignments) to be "nonconsenting members" as to the October 2016 Wells. The trial court determined that the JOA did not provide for the Operator to charge nonconsenting members any costs to drill; therefore, it awarded OGE its share of production from the October 2016 Wells without OGE paying any costs to drill.

### 2. The Parties' Challenges

Talisman and Statoil Texas challenge the trial court's interpretation that JOA Section 8 requires unanimous consent to drill absent one of the three exceptions noted by the trial court. Statoil Texas additionally challenges the trial court's failure to declare that the Term Assignments suspend provisions of Section 8. In addition, Talisman and Statoil Texas challenge the trial court's framework of participating, nonparticipating, and nonconsenting members. Talisman also challenges the award to OGE of $122,681, which represents cost-free revenue, and Statoil Texas challenges the trial court's failure to award it damages from Matrix Holdings and JAR for costs to drill the October 2016 Wells.

Matrix Holdings, JAR, and OGE generally defend the trial court's judgment within the framework of participating, nonparticipating, and nonconsenting members. Matrix Holdings and JAR, however, challenge the trial court's determination that they consented to the October 2016 Wells through the Term Assignments. JAR additionally asserts that the trial court erred by disregarding a jury finding awarding JAR damages, arguing on appeal that the trial court erroneously concluded that JAR was a "nonparticipating member" when the evidence showed it to be a "nonconsenting member."

### B.  Standard of Review and Applicable Law

The construction of an unambiguous contract is a question of law that we review de novo. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). "[T]he primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "To achieve this objective, [we] should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* "We construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (citation omitted).

### C.  Analysis

We agree with the parties that the JOA and Term Assignments are unambiguous. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (explaining ambiguity is a question of law for the court). We disagree, however, with the trial court's determination that there are only three exceptions to consent and its determination that the parties to the Term Assignments have given consent through the Assignments. We also disagree that a party can consent but not participate, which is the "nonparticipating member" category defined by the trial

court. The JOA allows only for members who consent/participate and for members who do not consent/do not participate, and the JOA uses the terms "consent" and "participate" interchangeably. We consider first the JOA alone, and then we construe the JOA in light of the Term Assignments.

### 1. Construction of JOA Section 8

The first sentence of JOA Section 8 states the prohibition against drilling wells without unanimous consent:

> Except as is otherwise provided in the preceding Section 7 or in this Section 8, no well shall be drilled on the leased acreage in search of oil or gas unless all parties hereto consent to the drilling of such well; provided, however, that neither the provisions of said Section 7 nor this Section 8 shall operate to relieve either party hereto from the obligations of reasonable development of the leased acreage for oil and gas or the obligation to prevent drainage of oil and gas from the leased acreage imposed by the jointly owned leases, as certain of such leases are modified by this agreement.

Matrix argues that this first sentence contains two exceptions to unanimous consent: reasonable development and to prevent drainage. OGE argues that the sentence states three exceptions: "(1) Section 7; and the express caveat for wells that the members are obliged to drill (2) to prevent drainage or (3) to reasonably develop." The trial court determined there to be only three exceptions to unanimous consent: "obligations in the underlying leases, to prevent drainage, and/or to reasonably develop."

The second sentence of Section 8 states:

> In the event the parties hereto cannot agree upon the drilling of any well for oil or gas, which well is not covered by the provisions of the preceding Section 7, then the party desiring to drill such well shall give the other party written notice of such desire, specifying the location, proposed depth and estimated cost of such well.

The sentences that follow give additional details regarding notice and cost and revenue sharing when a well is drilled without the parties' unanimous agreement. These provisions that follow

specify a balloting procedure and a non-consent penalty of 200%.[24]  Wells drilled under these balloting provisions "shall be drilled at the sole cost, risk and expense of the party electing to drill."

Harmonizing the introductory clause of Section 8 and the second sentence through the end, requires us to read an exception to the requirement of unanimous consent for wells drilled without consent but pursuant to the provisions for reallocating risks and costs to the consenting parties. *See Valence*, 164 S.W.3d at 662.  The first clause of sentence one provides: "Except as is otherwise provided in the preceding Section 7 or in this Section 8 . . . ."  This introduction indicates that the requirement for unanimous consent to drill a well, stated later in the sentence, is limited by Section 7 (which is not implicated here) and provisions that follow in Section 8.  What follows in subsequent sentences are the balloting provisions and the non-consent penalty "[i]n the event the parties hereto cannot agree."

Our interpretation does not render meaningless the phrase "no well shall be drilled . . . unless all parties hereto consent" because this phrase provides a baseline — no drilling without consent — from which a deviation to reallocate costs and risks can be made.  The 1956 Model Form Operating Agreement (Form 610) of the American Association of Petroleum Landmen includes a similar structure.  The form provides in its Section 11: "Without the consent of all parties: (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement . . . ."  Section 12 of the form provides for a balloting procedure and a non-consent penalty "[i]f all the parties cannot mutually agree upon the drilling of any well . . . ."  In summarizing these

---

[24] As the supreme court explained, "non-consent penalty" is the industry's nomenclature for a provision that in effect gives a bonus to working interest owners who consent; it is not "as its name suggests, a forfeiture or punitive provision."  *See Valence*, 164 S.W.3d at 659 n.2; *id.* at 666 (Brister, J., concurring); *see also id.* at 664 ("The non-consent penalty provision . . . is the mechanism utilized to allow the consenting parties the opportunity to recover their investments and receive defined returns from future operations.  For such operations, they undertake a financial risk that the non-consenting parties do not.").

provisions, the Fifth Circuit remarked: "Declining to participate or failing to make an election causes a party to be a non-consenting party. Consenting parties bear the cost and risk of drilling. Non-consenting parties avoid those risks, but are subject to a penalty." *Bonn Operating Co. v. Devon Energy Prod. Co., L.P.*, 613 F.3d 532, 533 (5th Cir. 2010). The Fifth Circuit had no difficulty drawing this meaning for these provisions. Its interpretation gives effect to the no-well-shall-be-drilled language while still allowing for drilling absent unanimous consent.

Matrix and OGE argue also that the "provided, however" clause in the first sentence limits the balloting provisions in the remaining sentences to only those exceptions stated in the "provided, however" clause. We disagree that the clause imposes the limit that Matrix and OGE suggest, which the trial court adopted. The "provided, however" clause qualifies or modifies what it applies to. *See Knight v. Chicago Corp.*, 144 Tex. 98, 188 S.W.2d 564, 566 (1945) ("provided, however" specifies a "limitation or restraint upon the authority defined in the clause immediately preceding it"); *see also ConocoPhillips Co. v. Ramirez*, No. 04-05-00488-CV, 2006 WL 1748584, at *3 (Tex. App.—San Antonio June 28, 2006, no pet.) (mem. op.) (citing *Knight* approvingly). By its terms, the clause applies to the "provisions of . . . this Section 8," which include the unanimous consent provision and the balloting procedures used "in the event the parties hereto cannot agree." The clause serves the purpose, not applicable here, of prohibiting a party from withholding consent when a well is necessary to satisfy either "the obligations of reasonable development" or "the obligation to prevent drainage." Matrix's interpretation of the "provided, however" clause would rewrite rather than harmonize Section 8 to turn the qualifying clause into an absolute bar on the use of balloting unless one of two conditions is satisfied — the proposed well is necessary for reasonable development or the proposed well is necessary to prevent drainage.

We also do not read Section 8 to establish three categories of "participating member," "nonparticipating member," and "nonconsenting member," as the trial court did. The balloting

provisions contain only two categories — "the party desiring to drill" and "the other party." These provisions apply "[i]n the event the parties hereto cannot agree upon the drilling of any well." In such a case, the working interest owners are described as either "the party desiring to drill" or "the other party." Upon receiving notice of a proposed well, "[t]he other party" has thirty days in which to notify the "party desiring [to] drill[]" whether it "elects to participate." "If any party shall elect not to participate" then the "party desiring to drill" may "be entitled to the benefits of this section." Those benefits are ownership of the well and recoupment of the 200% non-consent penalty. A "nonconsenting member" is thus within this framework, not outside of it, as the trial court held.[25]

Our interpretation is not unreasonable, inequitable, or oppressive, and it effectuates the business purpose of the JOA, which as stated in a recital, is to develop and operate leases for the production of oil and gas. *See Frost Nat'l Bank*, 165 S.W.3d at 312. Our construction, consistent with the plain language of JOA Section 8, allows for development by reallocating risks and rewards when agreement is lacking. Moreover, our interpretation is consistent with other provisions throughout the JOA that allow the parties to proceed despite disagreements.[26]

### 2. Impact of the Term Assignments

Section 8 allows a party "desiring to drill" to proceed despite non-consent from other working interest owners. If the balloting procedures are followed, "the party desiring to drill" proceeds at its "sole cost, risk and expense" but is entitled to the benefits of ownership of the well and oil and gas produced until the 200% non-consent penalty is satisfied. Talisman and Statoil

---

[25] Courts construing similar balloting provisions have construed only two categories of consenting and non-consenting owners and have used the terms "consent" and "participate" interchangeably. *See, e.g.*, *Bonn*, 613 F.3d at 533; *Dimock v. Kadane*, 100 S.W.3d 602, 605 (Tex. App.—Eastland 2003, pet. denied); *Valence*, 164 S.W.3d at 664; *XTO Energy Inc. v. Smith Prod. Inc.*, 282 S.W.3d 672, 678 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd).

[26] These provisions include Section 5, discussed below; Section 7, which specifies balloting procedures and a non-consent penalty similar to those in Section 8 for wells that do not fall under Section 8; Section 11, which allows for abandonment of wells despite disagreement; and Section 12, which allows for the surrender of leases despite disagreement. Sections 11 and 12 reallocate risks and rewards to the party desiring to maintain a well or a lease, respectively.

Texas argue that the Term Assignments require Matrix Holdings and JAR to consent to the drilling of wells proposed under Section 8. We, however, hold that the Term Assignments do not mandate consent from Matrix Holdings and JAR for wells drilled under Section 8 of the JOA. Stated differently, we hold the Term Assignments do not impact Section 8.

By the Term Assignments, Paul Kayser's successors (the "Assignors") assigned all of their rights under the JOA to the predecessors of Matrix Holdings, JAR, Talisman, and Statoil Texas (collectively, the "Assignees").[27] It is undisputed that Matrix Holdings, JAR, Talisman, and Statoil Texas hold their working interests in the Cooke Ranch subject to the Term Assignments. Under the Term Assignments, the Assignees assumed the rights, title, and working interests in the Cooke Ranch leases "subject to the terms" of the JOA. These Assignees also assumed and agreed to perform all the "duties, obligations and liabilities" of the JOA, "unless otherwise limited elsewhere" in the Assignments.

The Term Assignments required the Assignees to drill one well during a primary term that began in 2010 and lasted for four months. The Assignments would continue as long thereafter as they were maintained in force under their terms. Those terms include the following provision:

> After the Primary Term, Assignees shall commence, or cause to be commenced, actual drilling operations on Eagle Ford Wells on the Land at the rate of at least **three (3)** new Eagle Ford Wells per year. Assignees shall be in compliance with this three-well obligation if, on or before each annual anniversary date of the expiration of the Primary Term, the cumulative number of Eagle Ford Wells on which Assignees have commenced, caused to be commenced, or participated in actual drilling operations after expiration of the Primary Term in compliance with this Assignment is at least three times the number of anniversary dates that have followed the expiration of the Primary Term.

Another provision in the Term Assignments provides:

---

[27] For simplicity, the term "Assignees" includes, when necessary, the predecessors to Matrix Holdings, JAR, Talisman, and Statoil Texas, which were the original assignees; however, the focus of our analysis is on Matrix Holdings, JAR, Talisman, and Statoil Texas.

> Notwithstanding anything to the contrary in this Assignment, if Assignees fail to timely commence actual drilling operations on all Eagle Ford Wells or to conduct operations on them as required by this Assignment, the Assignor shall have the unconditional right to terminate this Assignment outside any Retained Tracts.[28]

The Term Assignments also provide that, upon termination, the Assignees shall lose all interests in the assigned leases, which automatically revert to the Assignors.

Talisman argues that the Assignees necessarily consented to drilling the wells required to meet the three-well-per-year obligation of the Term Assignments. Statoil Texas argues that the obligations to drill are inconsistent with and prevail over the non-consent provisions of JOA Section 8. The trial court declared: "All Term Assignees have consented, among themselves, for purpose of JOA § 8, to the drilling of the minimum number of [wells]."

We see no inconstancy between the Term Assignments and the JOA. "[W]hen two contracts between the same parties are inconsistent, we conclusively presume the later contract supersedes the earlier contract." *Cohen-sagi v. ProFinance Assocs., Inc.*, No. 04-08-00181-CV, 2009 WL 540217, at *3 (Tex. App.—San Antonio Mar. 4, 2009, pet. denied) (mem. op.) (citing *Willeke v. Bailey*, 189 S.W.2d 477, 479 (1945) and *IP Petroleum Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 899 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "If the determination of whether a later agreement supersedes a former agreement must be made by determining whether the language of the two contracts is inconsistent, the issue is a question of law." *Id.*

According to Statoil Texas, an inconsistency exists because the Term Assignments, on the one hand, do not contain a non-consent provision but require the drilling of three wells per year, while JOA Section 8, on the other hand, allows each owner a right to withhold consent. The contracts, however, can be harmonized. *See Courage Co., L.L.C. v. Chemshare Corp.*, 93 S.W.3d 323, 333 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (explaining first contract is enforceable

---

[28] A "Retained Tract" is generally defined as the surface area around a producing well.

to extent not in conflict with later contract). The Assignees, through JOA Section 8, may withhold consent to a proposed well and still comply with the three-well-per-year drilling obligation of the Term Assignments, so long as the proposed wells are drilled (after balloting and the reallocation of risk) or so long as other wells are proposed and receive unanimous consent. In fact, the circumstances of this case prove the point. Matrix Holdings and JAR withheld their consent to drill the October 2016 Wells pursuant to JOA Section 8. Nevertheless, the wells were drilled. The Term Assignments remained in force because the three-well-per-year requirement of the Assignments was satisfied for the year.

In short, JOA Section 8 is not impacted by the Term Assignments. Our interpretation gives full effect to the provision of the Term Assignments that the Assignees take their interests "subject to the terms" of the JOA, and, as we have determined, the terms of the JOA are not inconsistent with the terms of the Assignments. *See EOG Res., Inc. v. Hanson Prod. Co.*, 94 S.W.3d 697, 702 (Tex. App.—San Antonio 2002, no pet.) ("Used in its ordinary sense, the term 'subject to' means 'subservient to' or 'subordinate to' or 'limited by.'").

### 3. Declarations

With our constructions in mind, we turn now to the declarations and then to specific damages awards. The trial court made approximately 24 declarations, some with multiple parts. Talisman and Statoil Texas have challenged only certain of these declarations, and we address only those declarations. *See* TEX. R. APP. P. 38.1; *see also ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010).

Based on our analysis, we hold the trial erred by declaring:

> The JOA provides that no new well may be drilled without the consent of all members of the JOA, unless the members are obliged to drill it, under obligations in the underlying leases, to prevent drainage, and/or to reasonably develop.[29]

Talisman does not request that we render any declarations, and Statoil Texas asks that we render judgment "with the correct construction of Section 8."[30] A court of appeals has a duty to render the declaratory judgment that the trial court should have rendered. *See Cobb v. Harrington*, 190 S.W.2d 709, 715 (1945); *GRCDallasHomes LLC v. Caldwell*, 619 S.W.3d 301, 305 (Tex. App.—Fort Worth 2021, pet. denied); *see also* TEX. R. APP. P. 43.3. A declaration must serve a useful purpose or terminate a controversy between the parties. *See Bonham State Bank v. Beadle*, 907 S.W.2d 465, 468 (Tex. 1995). The purpose of the Uniform Declaratory Judgments Act, under which we render judgment, is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b); *see Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 269 (Tex. 2021); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 37.003(a) ("A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."). We render the following declaration:

> The JOA provides that no new well may be drilled without the consent of all members of the JOA, unless the members are obliged to drill it, under obligations in the underlying leases, to prevent drainage, and/or to reasonably develop, or if the balloting and non-consent-penalty provisions of Section 8 are complied with.

---

[29] The trial court made declarations by stating in one column a party's requested declaration (e.g., Matrix Requested Declaration 1, designated "MRD 1") and in a second column stating the trial court's action, such as "Not declared" or "The Court Declares: . . . ." To assist the parties, we specify which of the trial court's declarations we reverse by reference to the requested declaration. For example, the trial court's declaration that this footnote appends is the trial court's action in response to MRD 2.1. Under our nomenclature, this is "Declaration MRD 2.1," which we reverse.

[30] Statoil Texas also requests that we render certain specific judgments that it sought but was denied as well as declarations regarding wells drilled after the trial court's final judgment. We consider those requests to render below.

Based on our analysis, we also hold the trial court erred by establishing three categories of "participating member," "nonparticipating member," and "nonconsenting member," and we reverse the trial court's declarations specifically challenged by Talisman and Statoil Texas which (1) establish these categories, (2) state the rights and obligations of members of these categories, and (3) state any party's status as a "participating," "nonparticipating," or "nonconsenting" member.[31] We do not render declarations in place of those we reverse because we entirely reject the trial court's framework of "participating," "nonparticipating," and "nonconsenting" member. As described above, the balloting and non-consent-penalty provisions provide only for "the party desiring to drill" and "the other party."

We also disagree with the trial court's interpretation that the Term Assignees consented to drill wells, for purposes of Section 8, through the Assignments. We reverse the trial court's declarations to this effect.[32] We render the following declaration: "The Term Assignments do not mandate that a Term Assignee consent to the drilling of a well under JOA Section 8."

What remains are the rights and statuses of the parties as to wells that have been drilled — in other words, whether the 200% non-consent penalty applies to any of Matrix Holdings, JAR, TMRX, and OGE for the three October 2016 Wells. All of these parties did not agree with Talisman and Statoil Texas to drill the wells. The trial court declared Matrix Holdings and JAR to be "nonparticipating" as to these wells and TMRX and OGE to be "nonconsenting." This distinction resulted from the trial court's interpretation of the contracts to require Term Assignees

---

[31] Specifically, we reverse Declarations MRD 2.2, 2.3, 2.4, 3.1, and the two paragraphs of Declaration MRD 3.2 beginning "The JOA makes no provision for" and ending "does not apply to nonconsenting members." We also reverse Declaration ORD d.2 and Declaration SRD 38. The trial court's judgment provides that it incorporates interlocutory orders into the final judgment and that the final judgment prevails to the extent of any conflict. Statoil Texas challenges declarations in interlocutory orders. Therefore, we render the following judgment: "To the extent, if any, the Orders incorporated into the trial court's Amended Final Judgment conflict with the judgment of the Fourth Court of Appeals, the judgment of the Fourth Court of Appeals prevails."
[32] We reverse Declarations SRD 33 and 34.

to consent to some wells for purposes of Section 8. Again, we disagree with that interpretation. We render judgment as follows: "Matrix Holdings, JAR, TMRX, and OGE did not agree to drill any of the October 2016 Wells, and each is subject to a non-consent penalty, pursuant to JOA Section 8, as to these wells."

We refuse to render some declarations that Statoil Texas requests. Statoil Texas asserts that the trial court erred by failing to declare that the Term Assignments' three-well-per-year drilling obligation supersedes the JOA Section 8 consent/non-consent provision. We disagree, and, therefore, do not render a declaration in Statoil Texas's favor on this matter. We also do not render a related declaration that the Term Assignments' three-well-per-year drilling obligation "was enforceable by Statoil Texas against Matrix and JAR for their share of the $13 million drilling and completion costs found by the jury [for the October 2016 Wells]." Matrix Holdings and JAR did not consent to the October 2016 Wells; consequently, they are subject to non-consent penalties, but they are not obligated to share in costs. We also overrule Statoil Texas's Issue 4, which reframes the issue in terms of damages. By Issue 4, Statoil Texas challenges the trial court's failure to award it damages representing the share of costs Matrix Holdings and JAR would have borne had they consented to the October 2016 Wells. We deny Statoil Texas's request, in its Issue 6, for a declaration that the JOA does not grant ownership of production to a working interest owner without the payment of costs because the JOA does just that after the non-consent penalties are recouped.[33]

---

[33] We also deny Statoil Texas's related declaration, requested through its Issue 7, that a working interest owner's right to take production in kind is limited by the condition that it pay costs. As discussed in greater detail below, Section 13 of the JOA allows a working interest owner to receive its proportionate share of production in kind. The JOA does not condition taking production in kind on the payment of costs. With application of a non-consent penalty, it is possible for a working interest owner to own production after the non-consent penalty has been recouped and, under Section 13, to take production in kind thereafter without ever paying costs.

We also refuse Statoil Texas's requested declarations regarding whether the Term Assignees have an obligation to each other to drill three wells per year because, as discussed in our jurisdiction analysis, Statoil Texas does not have standing to pursue forward-looking declarations that do not resolve past disputes. In all years when Statoil Texas was a working interest owner and contract operator, at least three wells per year were drilled.[34]

We also do not declare, as Statoil Texas requests, the rights and statuses of the parties as to wells drilled in 2018, 2019, and 2020, after the trial court entered its final judgment. The record contains no evidence as to these wells, including whether the parties consented or did not consent to drilling. Absent any evidence regarding these wells, the trial court could not have entered declaratory judgment, and neither can we. *See Cobb v. Harrington*, 144 Tex. at 370; *GRCDallasHomes LLC*, 619 S.W.3d at 305; *Modular Tech. Corp., Metal Bd. Div. v. City of Lubbock*, 529 S.W.2d 273, 276 (Tex. Civ. App.—Amarillo 1975, writ ref'd n.r.e.) (holding appellate court could not render declaratory judgment when parties did not file pleadings addressing matter and fact questions remained to be resolved); *see also Waldrop v. Waldrop*, 552 S.W.3d 396, 411 n.9 (Tex. App.—Fort Worth 2018, no pet.) ("The Uniform Declaratory Judgments Act gives the trial court no power to pass upon hypothetical or contingent situations or to determine questions not then essential to the decision of an actual controversy, even though such questions may in the future require adjudication.").[35]

---

[34] Statoil Texas also does not have standing to appeal whether "[t]he district court erred by declaring that the parties did not join issue on the enforceability of the Term Assignment three-well-per-year drilling obligation between the Term Assignment assignees."

[35] We have addressed or dismissed Statoil Texas's eight issues that are stated in the "Issues Presented" portion of its appellant's brief, and "every subsidiary question that is fairly included." TEX. R. APP. P. 38.1(f); *see also St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 214 (Tex. 2020) (per curiam). Statoil Texas also provides, in an appendix to its brief, a "List of Unbriefed Issues Raised in the Trial Court Affected by the Court's Section 8 Consent Unanimity Ruling." Two of these "unbriefed issues" we have already considered and resolved because they present subsidiary questions to Statoil Texas's broad Issue 1 challenging the trial court's interpretation of Section 8. These subsidiary questions we have considered and resolved are: Unbriefed Issue 1: "Error in declaring that Cooke Ranch working interest owners were participating/non-participating, consenting/non-consenting, based on error in declaring that Section 8 required consent unanimity;" and Unbriefed Issue 7: "Error in failing to declare that Statoil Texas was

4. Damages Award to OGE

The trial court instructed the jury:

> If Talisman proceeded in the drilling of the October 2016 Wells, it will be in breach of the JOA. TMRX and OGE have not consented under the JOA to the drilling of the October 2016 Wells. TMRX and OGE will be entitled to their share of production from the October 2016 Wells.

The jury awarded OGE $122,681 in damages, representing revenue from the October 2016 Wells without any deduction for the 200% non-consent penalty provided for by JOA Section 8.[36] As we have held, JOA Section 8 does not provide for a nonconsenting party, such as OGE, to receive production without satisfying the 200% non-consent penalty. Therefore, we reverse the trial court's award to OGE and render judgment that OGE takes nothing on its claim for revenue from the October 2016 Wells.[37]

5. Failure to Award JAR Damages

The trial court set aside the jury's award to JAR of damages for unpaid revenue from three wells drilled without JAR's consent and without deducting any costs or a non-consent penalty. On appeal, JAR asserts that it is a "nonconsenting member," entitled to revenue without the application of the 200% non-consent penalty. Because we hold that an owner which does not

---

entitled to drill the three October 2016 Wells without the consent and over the objection of the Matrix Parties and OGE." We overrule the remaining "unbriefed issues," due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i); *see also St. John*, 595 S.W.3d at 214; *Carlo Motors Inc. v. De Los Santos*, No. 04-19-00055-CV, 2019 WL 3642655, at *2 (Tex. App.—San Antonio Aug. 7, 2019, no pet.) (mem. op.) ("An appellant waives any issues that are not adequately briefed because nothing is presented for our review when the appellant fails to cite relevant authority, provide relevant citations to the record, or provide substantive analysis of the issue raised in the brief."). The "unbriefed issues" that we overrule are: Unbriefed Issue 2: "Error in awarding a non-breach of contract remedy to OGE and TMRX for the declared breach of JOA Section 8 as to the October 2016 Wells;" Unbriefed Issue 3: "Error in awarding money damages to OGE and TMRX for the declared breach of JOA Section 8 as to the October 2016 Wells;" Unbriefed Issue 4: "Error in awarding money damages to OGE and TMRX in the absence of both pleading and proof of compensatory or special damages;" Unbriefed Issue 5: "Error in failing to declare that JOA Section 5 does not entitle OGE and TMRX to production revenues as a remedy for breach of Section 8;" and Unbriefed Issue 6: "Error in failing to hold that JOA Section 8 does not entitle OGE and TMRX to production revenues as a remedy for breach of JOA Section 8."

[36] The final judgment does not include a similar award for TMRX, which like OGE, is not subject to the Term Assignments.

[37] OGE does not contest that oil and gas produced from the wells has not exceeded 200% of costs.

consent under Section 8 must pay the non-consent penalty, the trial court did not err by setting aside the jury's award, albeit for a different reason. *See JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 396 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("JNOV or directed verdict is . . . proper when a legal principle precludes recovery."); *Rush v. Barrios*, 56 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("We will affirm a JNOV if . . . the evidence establishes an issue as a matter of law.").[38]

## IV. JOA Section 5

The parties also disagree on the interpretation of JOA Section 5 and the Term Assignments impact on this section, if any.

### *A.  Background*

Section 5 provides:

Operator shall make no single expenditure in excess of $2,500.00 without first obtaining the consent thereto by Non-operator; provided, however, that when Operator and Non-operator have agreed upon the drilling of any well on the leased acreage, Operator shall be authorized to incur any expenditure necessary in the drilling, equipping and completing of such well and the saving of the production therefrom without securing the additional consent of Non-operator.

The trial court instructed the jury:

Section 5 of the JOA requires Talisman, as Operator, to obtain the consent of Matrix, JAR, TMRX, and OGE, as Non-Operators, before Talisman can make any expenditure in excess of $2,500.00.  If Talisman, as Operator, and Matrix, JAR, TMRX, and OGE, as Non-Operators, agree upon the drilling of any well, Talisman is permitted to incur any expenditures *after* such agreement provided that any such expenditures are necessary in the drilling, equipping, and completing of such well and the saving of the production therefrom without needing additional consent.

(Emphasis added.)

---

[38] The trial court reached the same result we do by determining JAR was a consenting member through the Term Assignments.  We held above, the Term Assignments do not mandate consent.

Under the trial court's interpretation, the blanket authorization allowed under the "provided, however" clause of Section 5 extended only to expenditures incurred *after* the agreement to drill. Based on this instruction, the jury awarded Matrix $6,108,276 for "the amount that [Matrix] paid for expenses that Talisman incurred above $2,500 on a well before [Matrix] granted [its] consent to the drilling of that well."[39]

Talisman argues that the trial court erred in its interpretation of Section 5. Talisman argues that the "provided, however" clause allowed it to incur and charge other working interest owners for expenses made either *before* or *after* Talisman received consent to drill, so long as Talisman ultimately received consent. It asks that we render judgment that Matrix takes nothing on its claim for expenditures over $2,500 made prior to receipt of consent. Statoil Texas challenges two declarations the trial court made regarding Section 5.[40] In support of the trial court's interpretation, Matrix argues that the plain language of Section 5 limits the blanket authorization allowed under the "provided, however" clause to only those expenditures incurred *after* the parties have agreed on the drilling of a well.

### B. Analysis

We hold, and the parties agree, that Section 5 is unambiguous. *See Tawes*, 340 S.W.3d at 425. The sentence the parties look to in Section 5 begins with a clear temporal element: "Operator shall make no single expenditure in excess of $2,500.00 *without first obtaining* the consent thereto by Non-operator." (Emphasis added.) This plain language requires consent prior to an expenditure in excess of $2,500.

---

[39] This award applies only to wells for which Talisman ultimately received Matrix's consent to drill.

[40] It also argues that the Term Assignments supersede Section 5 because Section 5 conflicts with the Term Assignments. In its brief, Statoil Texas directs us to arguments it made with respect to Section 8, without adding new arguments. Accordingly, we reject its arguments as to Section 5 for the reasons discussed above as to Section 8. *See* TEX. R. APP. P. 38.1(i.).

The "provided, however," clause that follows alters this general provision.  *See Knight*, 188 S.W.2d at 566; *ConocoPhillips*, 2006 WL 1748584, at *3.  The "provided, however" clause states that it applies "when Operator and Non-operator *have agreed* upon the drilling of any well on the leased acreage."  (Emphasis added.)  Matrix argues that the past tense used in the clause indicates that the exception applies only after the parties "have agreed."  Talisman directs us to *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005), and argues that the clause does not bar "early" expenditures but places upon Talisman the risk that it might bear all costs for early expenditures if other working interest owners do not later consent.

In *Valence*, the supreme court considered a contract that required a party desiring to drill a well to give thirty days' notice of "the proposed operation" to other working interest owners.  *Id.* at 659.  These owners could then elect to participate in the proposed drilling or, if not, be subject to a non-consent penalty.  *Id.*  The operating agreement further provided:

> the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days . . . actually commence work on the proposed operation and complete it with due diligence . . . .

*Id.*  A working interest owner who did not consent sued and argued that the non-consent penalty did not apply because the operator did not "actually commence work" on "the proposed operation" "after the expiration of the notice period;" instead, the operator, commenced work *prior* to giving notice.  *Id.* at 660–61.  The supreme court determined that the contract did not place restrictions on when the operator may commence drilling and that nothing forbade the operator from commencing work before the end of the notice period.  *Id.* at 662–63.  The court stated:

> We recognize that this interpretation allows an operator to commence a new operation before the thirty-day notice period has expired; however, potential benefits may accrue to the owners for an operator's "early" commencement. For example, an early start may avoid detrimental occurrences such as the draining of an oil field by a neighboring operator or the expiration of an oil and gas lease. Moreover, the risk of early commencement of such operations falls entirely on the

operator because if none of the working interest owners consent to participation within thirty days, the operator bears the full cost of operations.

*Id*. at 663.

Similar to the contract in *Valence*, nothing in the "provided, however" clause of Section 5 specifies that the authorization applies only to expenses incurred *after* consent, as the trial court instructed. The clause simply provides that "when Operator and Non-operator have agreed upon the drilling of any well . . . Operator shall be authorized to incur any expenditures necessary . . . without securing the additional consent of Non-operator." We agree with Matrix that the clause only applies *after* "Operator and Non-operator have agreed," but the clause does not prohibit authorization, once given, from extending to past expenses. Like the election clause in *Valence*, Section 5 places the risk of "early" expenditures entirely upon the Operator. *See id*. Without an agreement to drill, the Operator has no basis to recover for expenditures made in excess of $2,500 and made without prior approval. *See id*. However, when working interest owners give consent to drill (so as to share in production without paying non-consent penalties under Section 8), those consenting owners authorize the Operator to incur any expenditures "necessary in the drilling, equipping, and completing" of the wells under the blanket authorization allowed by the "provided, however" clause.

As in *Valence*, our interpretation provides a potential benefit to working interest owners from an operator's "early" expenditures because it allows working interest owners to assess costs already incurred before consenting. *See id*.; *see also Bonn*, 613 F.3d at 535 (applying *Valence* when notice had been given after well had been completed and "after the majority of the risks associated with drilling had been determined"). Our interpretation is also in harmony with Section 8's explicit calibration of risks and rewards to the parties that consent to drill. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Section 8 provides: "Any well drilled under the provisions of

this section [8] shall be drilled at the sole cost, risk and expense of the party electing to drill." The plain language of the JOA and its calibration of risk and reward, however, does not support the trial court's contrary interpretation that would allow Matrix to avoid sharing in the burden of necessary expenditures on wells it consented to.

Therefore, we reverse the trial court's declaration stating its erroneous interpretation of Section 5, but we do not render a declaration because Talisman and Statoil Texas have not specifically requested that we do so as to Section 5. *See* TEX. R. APP. P. 38.1(j).[41] We also reverse the trial court's judgment to Matrix of $6,108,276, and we render judgment that Matrix takes nothing on its claim for expenditures over $2,500 prior to Talisman's receipt of consent.

## V.  JOA Section 13

In cross-issues, Matrix and Talisman challenge the trial court's declarations regarding Section 13 of the JOA.[42] Section 13 allows a working interest owner to take its share of production in kind. Talisman requested declarations that it was not required to install facilities for the joint account of the working interest owners; it argues that owners wishing to take in kind must install any required facilities. Matrix requested declarations that would allow it to take production in kind by "tapping" into an 8-inch pipeline on the gathering system that led to the CDP (the "D8" Pipeline"). The trial court denied both sides' requests. It denied Matrix's requested declarations that it could tap into the D8" Pipeline, and it declared that the Operator had to insure "sufficient facilities" at each well for a working interest owner to install "appropriate facilities" to take production in kind. We review first Talisman's issue concerning whether it must install any

---

[41] We reverse Declaration MRD 1.

[42] Talisman joined in Statoil Texas's challenge. *See* TEX. R. APP. P. 9.7. Because Statoil Texas does not have standing to pursue its issue related to Section 13, we discuss the issue as Talisman's.

facilities for taking in kind. We then consider Matrix's issue regarding whether it can tap into the

D8" Pipeline.

### *A. Sufficient Facilities*

#### 1. Background

Section 13 provides, in pertinent part:

Subject to the other provisions of this agreement, all oil and gas produced and saved from the leased acreage and not required in the conduct of operations hereunder shall be shared by the parties hereto, and owned in severalty, in proportion to their respective interests, and each party hereto shall be entitled to separately dispose of or receive in kind his or its proportionate share thereof, subject, however, to the following provisions:

> (a) Should any party hereto require facilities for the taking in kind or separate disposition of his or its share of such oil and gas, which facilities are in addition to those installed by Operator for the benefit of the joint account of the parties hereto, such party shall bear and pay in cash any additional expense incident to the construction, installation and maintenance of such additional facilities.

The trial court declared:

Operator has not deprived another member of the JOA of its right to take its production in kind, without payment of facility use fees, so long as it insures that there are sufficient facilities owned by the joint account at each well to allow the member to install appropriate facilities for taking in kind.[43]

#### 2. Analysis

In its appellant's brief, Statoil argues, "[t]he district court declared that the Operator must

insure that there are 'sufficient facilities,' chargeable to the joint account, to allow a member who

desires to take production in kind to install appropriate facilities for that purpose. . . . The Operator

owes no such duty." TMRX responds, "because the [working interest] owners must have the

ability to [take in kind] *somewhere*, the trial court declared that the Operator must have 'sufficient

---

[43] The trial court defined "facility use fees" in the first part of the declaration. Because Talisman has not challenged this first part, we affirm it without further consideration, and we consider only Talisman's challenge to the quoted language.

facilities owned by the joint account at each well to allow the member to install appropriate facilities for taking in kind.'"  Statoil replies, "Matrix may take in kind at the wellhead of each Cooke Ranch well, because those locations are the *only* locations of facilities charged to the joint account."  To the extent the trial court declared that Section 13 of the JOA requires the Operator to construct, install, or maintain facilities in addition to the existing facilities installed by the Operator for the benefit of the joint account of the parties, the trial court erred.

Section 13 provides that, if "any party . . . require[s] facilities for the taking in kind . . . such party shall bear and pay in cash any additional expense incident to the construction, installation and maintenance of such additional facilities."  This plain language imposes upon the party that "require[s] facilities" the obligation to "bear and pay" "any additional expense incident to the construction, installation and maintenance of such additional facilities."  *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 124 (Tex. 1996) (Owen, J., concurring) ("Parties to a lease may allocate costs, including post-production or marketing costs, as they choose.").

Section 13 places no obligation upon the Operator to insure that there are facilities — required, sufficient, appropriate, or otherwise.  Section 13 acknowledges that there may exist "facilities . . . installed by Operator for the benefit of the joint account of the parties;" however, this acknowledgement simply makes clear that facilities an owner may require for taking in kind — and for which the owner alone is financially responsible — are those in addition to facilities provided for the benefit of the joint account, which are paid for jointly.  The parties recognize that the Operator has some obligation to install facilities to "produce and save" oil and gas; however, the Operator's obligation to produce and save does not imply an obligation to install facilities for taking in kind, which only occurs after production and saving.  *See Exxon Corp. v. Middleton*, 613 S.W.2d 240, 244 (Tex. 1981) ("Production means actual physical extraction of the mineral from the land."); *cf. Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198,

201, 207, 211 (Tex. 2019) (determining parties agreed to an "at the well" valuation when assignment of royalty interests in oil and gas "produced and saved" specified that delivery was to be into pipelines, tanks, or other receptacles connected to wells).

We hold the plain language of Section 13 places the obligation to construct, install, and maintain additional facilities upon the working interest owner requiring any such facilities to take production in kind. Consequently, to the extent the trial court's declaration requires the Operator to construct facilities for the benefit of the joint account in addition to the wellheads to allow the working interest owners to take in kind, we reverse the trial court's declaration that requires the Operator to insure "sufficient facilities."[44]

### B. D8" Pipeline

#### 1. Background

As explained above, Section 13 provides that a working interest owner may take production in kind, and it must "bear and pay in cash any additional expense incident to the construction, installation and maintenance of . . . additional facilities." "Additional facilities" do not encompass "those installed by Operator for the benefit of the joint account of the parties." Matrix argues that the D8" Pipeline is a facility installed by Talisman for the benefit of the joint account, and Matrix seeks to tap into the D8" Pipeline to take production in kind. It asserts that the D8" Pipeline is "[t]he best and most reasonable place" for it to exercise its right to take in kind because tapping the D8" Pipeline would allow "a *single* tap in the gathering system before the Cooke Ranch production reaches the CDP — and not separate taps at *each* of the wellheads."

---

[44] We reverse the portion of Declaration MRD 5, quoted above, which begins "Operator has not deprived" and ends "for taking in kind." We do not reverse Declarations SRD 9 and SRD 31, as requested, because there is nothing to reverse. The trial court did "Not Declare[]" any matters with respect to SRD 9 and SRD 31 but only referred back to MRD 5. We do not render declarations as to Section 13 because Talisman did not specifically request that we do so. *See* TEX. R. APP. P. 38.1(i), (j).

On appeal, Matrix challenges several determinations by the trial court. First, it challenges the trial court's determination that Matrix has no ownership interest in the D8" Pipeline. The trial court made this determination in an interlocutory judgment, which it incorporated into the final judgment. Second, Matrix challenges the trial court's denial of several of its requested declarations concerning a purported entitlement to tap into the D8" Pipeline. We look first at the trial court's ownership determination and then at the denied declarations.

### 2. Ownership of the D8" Pipeline

Talisman pled for a declaration that the JOA does not grant Matrix an ownership interest in the CDP and its gathering facilities, including the D8" Pipeline. Conversely, Matrix pled for a declaration that the parties own the CDP and its gathering facilities in proportion to their working interest ownerships. Prior to trial, the parties moved for partial summary judgment, and in an amended order on Talisman's cross motion for partial summary judgment on ownership, the trial court declared: "The JOA does not automatically grant non-operators an ownership interest in the facilities used for processing and gathering located physically on or near the Cooke Ranch, construed [sic] by Talisman and Statoil for their own use even if the facilities also provide services charged to the joint account." The order identifies 23 facilities for which the trial court granted Talisman's motion, including facilities that comprise the CDP. The order lists four facilities for which the trial court denied the motion, including the D8" Pipeline. Ownership of the D8" Pipeline remained a live issue heading into trial. The parties dispute whether, at trial, Matrix's counsel conceded ownership of the D8" Pipeline to Talisman and Statoil by judicial admissions.

A "true" judicial admission is a formal waiver of proof usually found in a pleading or stipulation of a party. *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980). A counsel's statement on behalf of a client may serve as a judicial admission if five elements are met: (1) a statement made during the course of a judicial proceeding; (2) that is

contrary to an essential fact or defense asserted by the person making the admission; (3) that is deliberate, clear, and unequivocal; (4) that, if given conclusive effect, would be consistent with public policy; and (5) that is not destructive of the opposing party's theory of recovery. *In re M.M.O.*, 981 S.W.2d 72, 84–85 (Tex. App.—San Antonio 1998, no pet.). Matrix contends that counsel's statements conceded ownership only as to the 23 facilities determined by the trial court's interlocutory summary judgment order, but not as to the D8" Pipeline and the three other facilities whose ownership the trial court had not resolved prior to trial.

After reviewing the record and the context in which Matrix's counsel made his statements, we agree with Talisman that Matrix's counsel deliberately, clearly, and unequivocally conceded ownership of the D8" Pipeline. Matrix's counsel made the strategic decision to concede ownership of the CDP and all gathering facilities, including the D8" Pipeline, and argued instead only that the facilities were "for the benefit of the joint account."

Talisman directs us to five statements made by Matrix's counsel on the trial record in which he conceded ownership. First, Statoil's counsel interrupted a question posed to a witness by Matrix's counsel that touched upon ownership of the CDP. The parties' counsel and the trial court discussed the court's interlocutory ownership ruling, including the unresolved ownership of four facilities, and then Matrix's counsel stated:

> If he would have let me finish this last question, I said even if you don't own the CDP. So I'm not going to contest the ownership, as [Statoil's counsel] is objecting to. But No. 2, your [interlocutory order on ownership] left open the issue as to whether the CDP, regardless of ownership, was for the benefit of the joint account.

Second, regarding another question to the same witness, counsel and the trial court again discussed the interlocutory order. Matrix's counsel asserted: "The Court specifically, in the [interlocutory order], left open the issue of whether the CDP — whether equitable title would inure[.]" The trial court commented that ownership of four facilities remained unresolved because

all working interest owners had been billed at one time for those facilities. Matrix's counsel then asserted: "Which doesn't address the benefit of the joint account. It's a difference." Soon thereafter, Matrix's counsel asserted:

> To be clear, I understand the Court's ruling, although the language that was being used [in a question to the witness] was "for the benefit of the joint accounts" which is verbatim from Section 13 of the Joint Operating Agreement and has nothing to do with the ownership of the CDP and the gathering lines, which I haven't argued for.

Third, on another day of trial and regarding a question asked of another witness, Matrix's counsel asserted: "I am not questioning ownership. Judge, I've consistently said that I'm not contesting ownership. I understand the Court's ruling."

Fourth, as to another question posed to a witness regarding CDP fees, Matrix's counsel objected, stating: "Getting into ownership again. I've argued ownership. I've conceded."

Fifth, when discussing the jury charge, Matrix's counsel stated: "I think there's some misconception that we're asking for ownership of the CDP, because we're not. But we are contesting, especially with respect to the gathering lines, whether it's for the use of the joint account."

By these statements, Matrix's counsel judicially conceded ownership of the CDP and its gathering facilities, including the D8" Pipeline. Counsel did not withhold his concession from applying to the four facilities left unresolved after partial summary judgment; instead, he made clear only that his concession did not apply to the matter of whether the CDP and its gathering facilities were "for the benefit of the joint account." Matrix's counsel made clear that he was not arguing for "ownership of the CDP and the gathering lines," that he "argued ownership" and "conceded," and that Matrix "contest[ed], especially with respect to the gathering lines, whether it's for the use of the joint account." On this record, Matrix's counsel deliberately, clearly, and unequivocally stated on the trial record a concession of ownership of the CDP and its gathering

facilities, including the D8" Pipeline. *See In re M.M.O.*, 981 S.W.2d at 84–85. The concession is contrary to Matrix's defense to requested declarations of ownership in Talisman's favor, and the concession is not destructive to Talisman's theory of recovery. *See id.* Giving effect to Matrix's concession is consistent with public policy because it would be unjust to permit Matrix to recover after it had disclaimed ownership. *See Laredo Med. Grp. Corp. v. Mireles*, 155 S.W.3d 417, 429 (Tex. App.—San Antonio 2004, pet. denied) ("This rule [for a judicial admission] is based on the public policy that it would be unjust to permit a party to recover after he has sworn himself out of court by a clear, unequivocal statement.").

After trial, the trial court entered an interlocutory judgment on ownership of the CDP and its gathering facilities, in which the trial court declared: "[T]he JOA does not grant [Matrix and OGE] any ownership interest in any of Talisman and Statoil's processing and gathering facilities located physically on or near the Cooke Ranch, including but not limited to the CDP Facilities described in this Judgment, and any other post-production facilities associated with the Cooke Ranch." The interlocutory judgment specifies that it applies to the D8" Pipeline. Later, the trial court incorporated the interlocutory judgment on ownership into the final judgment. We overrule Matrix's challenge to the trial court's determination that Matrix has no ownership interest in the D8" Pipeline.

### 3. Right to Tap into the D8" Pipeline

Matrix argues that the trial court erred by denying its requested declarations that would entitle Matrix to tap into the D8" Pipeline to take production in kind. Matrix argues the trial court's denial followed from its declaration that Matrix does not have an ownership interest in the D8" Pipeline. It further asserts that the D8" Pipeline is its joint property and that we should remand for reconsideration of the requested declarations. Matrix also argues that the "best and most reasonable place" to take production in kind would be at a single tap on the D8" Pipeline.

Matrix's arguments do not establish that the trial court erred or that Matrix is entitled to declaratory relief. A party seeking declaratory relief has the burden of proving that it is entitled to the requested relief. *Harkins v. Crews*, 907 S.W.2d 51, 58 (Tex. App.—San Antonio 1995, writ denied). As discussed above, Matrix conceded ownership of the D8" Pipeline; consequently, the trial court did not err by denying declarations to the extent its denial was based on Matrix's lack of a joint ownership interest in the CDP and its gathering facilities. The trial court also did not err by denying Matrix's requested declarations if denial was based on Matrix's assertion that the D8" Pipeline is the "best and most reasonable place" to take production in kind. Regardless of whether the evidence bears out this assertion, Matrix has not established how the fact would entitle it to tap into the D8" Pipeline pursuant to the JOA or otherwise.[45] In short, Matrix has not shown an entitlement to its requested declarations regarding tapping into the CDP gathering facilities, including the D8" Pipeline, and we hold the trial court did not err by denying Matrix's requested declarations on the matter.[46]

## VI. Damages Awarded Pursuant to Jury Questions 1b(7), (11), (14), (16), and (18)

In a broad issue, Talisman argues no evidence supports "miscellaneous damages" awarded to Matrix and OGE against Talisman pursuant to jury questions 1b(7), (11), (14), (16), and (18) because the evidence conclusively establishes the opposite of a vital fact as to each of the awards.

### A. Standard of Review

When considering whether legally sufficient evidence supports a jury's verdict, we must consider the evidence that favors the verdict if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802,

---

[45] Relatedly, Matrix has not shown that the trial court's ruling "shuts the Matrix parties out of the Cooke Ranch." Under Section 13 of the JOA, Matrix may take production in kind by installing the facilities it requires to do so.
[46] Specifically, we affirm the trial court's final judgment to the extent it denies Matrix's requested Declarations MRD 4.4, 4.5, and 4.6.

827 (Tex. 2005). We view the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it. *Id.* at 822. Evidence is legally sufficient if it would enable a reasonable factfinder "to reach the verdict under review." *Id.* at 827. We may not sustain a legal sufficiency, or "no evidence," point unless the record demonstrates (1) a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. Talisman argues the last category.

### B. *Jury Questions 1b(7), (16), and (18)*

As to the jury's findings to questions 1b(7), (16), and (18), Talisman argues "the 'evidence conclusively establishes the opposite of [the] vital fact' found by the jury: Talisman paid all the[] amounts" at issue. (quoting *id.* at 814). Matrix and OGE argue that the record contains conflicting evidence from which the jury was entitled to draw its own conclusions regarding whether Talisman had paid the amounts the jury found were owing.

#### 1. Jury Question 1(b)(7): Line Fill

Line fill consists of oil and gas used to fill a pipeline to ensure flow through the pipeline. The jury was asked to state, "the amount that Talisman should have paid the plaintiffs for use of gas production to fill pipelines." It answered $733,557 as to Matrix and $165,093 as to OGE, and the trial court awarded judgment in these amounts.

Matrix directs us to testimony to support the award. Matrix's Vice President of Finance, Steve Ives, explained in his trial testimony that line fill is measured in terms of "days' worth" of production. Ives testified that in 2013 or 2014, the pipeline operators serving the Cooke Ranch required an increase in line fill from five to twenty days' worth of production. Ives analyzed the billing statements Matrix received from Talisman and determined that in certain months, Matrix

was paid much less in revenue for lower production volumes of ethane, propane, butane, and pentane (collectively, natural gas liquids or "NGLs") and for oil. Ives concluded that, for those months, production of NGLs and oil was used as line fill, rather than sold. Ives testified that he found no evidence in the billing statements that the production used as line fill for NGLs and oil was ever paid to Matrix, although he acknowledged there were adjustments for condensate. Matrix's accounting expert, Jeffrey Spilker, testified that he and Ives search all of the joint interest billing statements ("JIBs"). Spilker determined that Talisman gave Matrix credit for production from 2013 that was used as line fill but that no credit was given for production from 2014 used as line fill.

In contrast, Talisman's head of accounting, Brian Robertson, testified that Matrix and OGE were "fully paid" for production used as line fill. Talisman's lead accountant for revenue accounting, Corinne Bugamelli, testified that she reviewed accounting records to verify payment. She testified that payment occurred in March 2016, when Statoil took over operations. Bugamelli stated that Talisman created accounting spreadsheets that showed production delivered as line fill in April, May, and June 2013, and that corrections were done to "release the linefill" in March 2016. She explained that one could look at JIBs to determine if the working interest owners were paid.

The evidence does not conclusively establish that Talisman paid Matrix and OGE for their share of production used as line fill, as Talisman contends. Robertson's testimony is conclusory and does not establish the disputed fact of payment as a matter of law. *See Rockwall Commons Assocs., Ltd. v. MRC Mortg. Grantor Tr. I*, 331 S.W.3d 500, 512 (Tex. App.—El Paso 2010, no pet.) ("Legal conclusions and conclusory statements in an affidavit, without more, are insufficient to establish a right to summary judgment as a matter of law."). Bugamelli's explanation does not necessarily contradict Spilker's testimony. Bugamelli testified as to production from 2013, and

Spilker testified that Talisman gave Matrix a credit related to production from 2013. Spilker, however, testified that his review of JIBs showed that no credit was given for production from 2014 used as line fill. Ultimately, the evidence on the matter consists of conflicting statements by accountants who reviewed relevant records and reached different conclusions as to whether Talisman had paid for production used as line fill. Under these circumstances, Talisman's payment was a disputed factual matter that the jury was free to resolve. *See In re S.R.B.*, No. 11-12-00310-CV, 2014 WL 2767116, at *2 (Tex. App.—Eastland June 12, 2014, no pet.) (mem. op.) (recognizing fact question existed as to whether child support was paid where mother claimed she had not received checks and father testified he mailed checks and presented bank statements that showed checks had been cashed)*; cf. McKeehan v. Wilmington Sav. Fund Soc'y, FSB*, 554 S.W.3d 692, 700 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (plaintiffs did not prove bank misapplied payments because there was some evidence from bank's records to support both plaintiffs' contention of misapplication and bank's position of correct application); *Tex. Emps.' Ins. Ass'n v. Locke*, 224 S.W.2d 755, 759 (Tex. Civ. App.—Fort Worth 1949, writ ref'd n.r.e.) (remarking as to proving a negative as a fact: "Generally, if a witness shows to have been in a position to know a fact and says in effect that he did not see or hear it, or that it did not happen in so far as he knows, such testimony has probative value . . . .").

### 2. Jury Question 1b(16): Targa Condensate

Similarly, as to fluid condensate, the record contains conflicting statements by witnesses who reviewed relevant payment records. Under these circumstances, the jury was free to determine the disputed matter of whether payment had been made and to conclude, as it did, that Talisman failed to pay Matrix $156,731 and OGE $37,080 "for condensate (Targa fluid condensate) sold but not accounted for in revenues to plaintiffs."

Fluid condensate is oil that condenses from gas. The condensate at issue resulted when gas flowed through a pipeline to a purchaser, Targa. Targa collected the liquid and paid Talisman for it. David Reeves testified that Targa's payment to Talisman occurred through an "accounting balance." He testified that he reviewed Talisman's revenue statements, which showed how much money Targa paid Talisman, and determined Matrix's interest in Targa's payment to Talisman for the condensate. He also testified that he "reviewed some, [but] not all of the joint interest billings," and saw no evidence that Talisman paid Matrix for its share of the condensate.

Talisman directs us to Robertson's conclusory statement of full payment discussed above, which does not prove payment as a matter of law. *See Rockwall Commons Assocs.*, 331 S.W.3d at 512. It also directs us to testimony from its damages expert, David Lerman. Lerman testified that Talisman produced a "liquid sales by contract report" every month. Lerman presented the May 2015 report as an example to explain how the report shows the payment of condensate revenue to all working interest owners. Lerman, however, did not explain if the condensate revenue was reported in JIBs and, if so, why Reeves's analysis based on the JIBs was invalid. As with the issue of line fill payment, the trial record regarding condensate payment consists of competing testimony by witnesses who reviewed invoice and billing records to reach different conclusions regarding whether the records reflected full payment. On this record, we reject Talisman's argument that it conclusively proved payment to Matrix and OGE for condensate sold to Targa.

### 3. Jury Question 1b(18): Off-Spec Y-Grade NGLs

The last category for which Talisman asserts it conclusively proved payment to Matrix and OGE is for "off-spec Y-grade NGLs." This category concerns an NGL mixture sold by Talisman for which Matrix and OGE claim they did not receive payment. Based on the jury's findings, the

trial court awarded Matrix $166,098 and OGE $39,298 as "[r]evenues not paid due to the improper accounting of Off-Spec Y-Grade NGLs that Talisman sold."

As with line fill and condensate, competing testimony regarding payment of the NGL mixture was introduced. Reeves testified that he reviewed some JIBs and did not see evidence that Matrix was paid for off-spec Y-grade NGLs. Robertson testified that Talisman made a "catch-up" payment to Matrix in April 2014 and that payment for the NGLs was paid monthly thereafter. Bugamelli testified, similarly to Robertson, that no working interest owner was paid for Y-grade NGLs "early on," but "looking at the records, it shows . . . that all the historical trucked Y grade from December 2012 through to February of 2014 was paid in April of 2014." Bugamelli explained that the records she reviewed were produced from a "data pull" from Talisman's accounting system. According to Bugamelli, after April 2014, the process was fixed to provide for monthly payments to working interest owners.

As with the condensate payments, Reeves reviewed JIBs while Talisman's witness reviewed reports created through Talisman's accounting system. Talisman's witness did not address JIBs or Reeves's analysis. Based on competing conclusions drawn by witnesses from their reviews of different records, we hold that, as to off-spec Y-grade NGLs, Talisman did not conclusively prove payment to Matrix and OGE.

### C. Jury Questions 1b(11), and (14)

Talisman argues as to the amounts awarded pursuant to the jury's answers to questions 1b(11) and (14) that the evidence establishes the opposite of a vital fact: these amounts were never owed.

### 1. Jury Question 1b(11): TEAK Pipeline Bonus

The trial court awarded Matrix $123,653 and OGE $29,830 based on the jury's answer to question 1b(11), which asked for the "TEAK pipeline bonus amounts that Talisman should have passed on to the plaintiffs."[47]

Matrix's accounting expert, Jeffrey Spilker, testified that Matrix's claim related to a transportation prepayment Talisman made to a pipeline operator to ensure Talisman could utilize the pipeline. The pipeline operator, TEAK, would refund the prepayment if Talisman used the pipeline. Spilker calculated that Matrix's share of the refunded prepayment was $123,653 and OGE share was $29,830, based on the parties' working interest ownerships. Spilker, however, did not know whether Talisman charged Matrix for its share of the prepayment, which could entitle Matrix to a share of the refund. He testified:

> I sat down with Mr. Ives [Matrix's Vice President of Finance]. Even went over to his office. We couldn't identify whether or not those costs were actually charged or if they were, because — there were a lot of different transportation and marketing charges.

Talisman's damages expert, Lerman, on the other hand, testified: "Talisman did not charge the joint accounts for those extra costs. . . . It's not in the joint account books and records."

Here, Lerman's undisputed testimony is dispositive. "[A]n appellate court conducting a legal sufficiency review cannot disregard undisputed evidence that allows of only one logical inference." *City of Keller*, 168 S.W.3d at 814 (citation omitted). Lerman stated that he reviewed the relevant records and determined Matrix and OGE were not charged for the prepayment. Consistent with Lerman's testimony, Spilker testified that he could not identify whether the

---

[47] OGE asserts that Talisman waived this issue by not moving to disregard the jury's answer to this question; however, Talisman did just that in its motion to modify the judgment.

prepayment was charged to Matrix. Because the jury was not free to reach a verdict contrary to Lerman's undisputed testimony, we reverse the judgment as to the TEAK pipeline bonus. *See id.*

### 2. Jury Question 1(b)(14): Marketing Fees

The last of Talisman's legal sufficiency challenges to "miscellaneous damages" relates to the jury's finding under question 1b(14) that Matrix sustained $265,118 in damages for "[a]mounts Talisman charged for internal marketing fees the JOA did not authorize." As with the TEAK pipeline bonus, undisputed testimony establishes that Matrix was not charged unauthorized internal marketing fees.

Matrix's claim regarding marketing fees arises based on a "Decision Summary" which states Talisman's decision to charge Matrix unauthorized internal marketing fees.[48] The Decision Summary states: "Decision is made to charge all well working interest owners, other than Statoil or those who Take in Kind, a marketing fee as compensation for handling all aspects of marketing and selling their product." An "Authorization" section at the end of the document is followed by six blank signature lines. Talisman argues the unsigned document indicates that the decision to charge internal marketing fees was never implemented. Internal Talisman emails reveal a discussion about whether to charge marketing fees. In an email dated July 1, 2015, a Talisman employee discussed edits to the "Decision Summary." A recipient to that email responded on July 16, 2015: "Did you ever get full internal buy-in to the marketing fees?" The original sender responded the next day: "It looks like we would charge Matrix $635.95 . . . ." The record also contains an invoice Talisman sent to JAR dated July 28, 2015. This invoice lists an item for "Marketing Fees (see schedule)" and below that specifies fees for "Gas," "Oil/Cond," and "NGLs"

---

[48] Internal marketing fees are marketing fees Talisman purportedly charged the working interest owners. External marketing fees are marketing fees charged by companies that are not parties to the JOA. Talisman does not dispute that internal marketing fees would be unauthorized under the JOA; it argues that such fees were not charged. We assume, without deciding, that the fees would be unauthorized if charged.

of \$34,324.77, \$29,275.55, and \$64,446.06, respectively. The exhibit does not include any additional schedule, and the parties have not directed us to another exhibit with a schedule of charges.

Matrix argues that the jury could have inferred, based on the unsigned Decision Summary, the emails, and the invoice that followed shortly after the emails, that the "Marketing Fees" in the invoice related to the unauthorized internal marketing fees discussed in the Decision Summary and emails. Matrix's accounting expert, Spilker, could not say whether internal marketing fees were charged through the invoice because the JIBs and other accounting data he reviewed were not detailed enough to establish the exact nature of the marketing fees charged.

Talisman's witnesses, on the other hand, stated that internal marketing fees were not charged to Matrix or OGE based on their knowledge of Talisman's accounting system and review of documents. Bugamelli testified that the process to assess internal marketing fees would have been implemented by her group through their Production Accounting Solutions ("PAS") system, but "[i]t did not get implemented." Talisman's damages expert, Lerman, testified that he looked into the "books and records of the joint account" and only found that external marketing fees were charged.

Bugamelli's and Lerman's testimony that internal marketing fees were not charged is disputed only by inferences that (1) a Decision Summary was authorized despite the fact that signature lines in an "Authorization" section were blank and (2) "Marketing Fees" in an invoice were for unauthorized internal marketing fees, rather than authorized external marketing fees, because the possibility of charging internal marketing fees was discussed by email two weeks before the invoice was sent. For his part, Spilker could not say whether the fees were unauthorized because the records he reviewed were not sufficiently detailed. The two inferences required by the jury to reach its verdict violate the equal inference rule, "which provides that a jury may not

reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another." *Hancock v. Variyam*, 400 S.W.3d 59, 70–71 (Tex. 2013) (citation omitted). The inferences necessary to support the jury's answer to question 1b(14) were no more probable than the opposite inferences that the Decision Summary was never authorized and that the Marketing Fees charged on the invoice were for authorized external marking services. Without the disallowed inferences, Bugamelli's and Lerman's testimony that internal marketing fees were not charged is uncontradicted. Therefore, the evidence conclusively establishes the opposite of a vital fact, and we reverse the judgment as to internal marketing fees. *See City of Keller*, 168 S.W.3d at 814.

## VII. Interim CDP Fees

In their appeals, Matrix and OGE challenge the trial court's awards to Statoil Pipelines of "interim CDP fees." The final judgment states:

> The Court RENDERS JUDGMENT for Statoil Pipelines, against the Matrix Parties, TMRX, and OGE, for interim CDP fees, under the May 5, 2016, Rule 11 Agreement, for the period of June 2016, through November, 2017, for gas, and December, 2017, for oil, as follows:
>
> 1. Matrix Holdings: $36,268.
>
> 2. JAR Resources: $231,310.
>
> 3. TMRX Resources: $291,295.
>
> 4. OGE: $150,708.

Matrix and OGE challenge the award on several grounds. We consider first OGE's jurisdictional challenge, and then we consider a dispositive challenge: that Statoil Pipelines failed to seek or obtain a jury finding on the elements of a cause of action that could support the awards.

### A.  Background

On May 5, 2016, the parties entered into a Rule 11 agreement "[i]n lieu of an injunction." The parties agreed that Matrix and OGE could take their share of production in kind "on the downstream side of the CDP."  They also "agreed to interim rates for fees charged for volumes delivered through the gathering system and CDP," and these rates were set out in a separate Rule 11 agreement at $0.25 per mcf for natural gas and $1.325 per barrel for condensate.  The Rule 11 agreement further states: "The parties agree that these interim rates shall be applicable until the entry of a final judgment in the trial court in this case."  The agreement also provides: "The parties are preserving all rights to contest the rates set out in this agreement and the Rule 11 on rates and to seek damages at trial."  Another term provides: "[Talisman]/Statoil may demand it[s] full rates for transport and process through [the] gathering system and CDP as damages at the trial." Pursuant to the agreement, Matrix and OGE paid Statoil interim CDP fees before trial.

After entering the agreement, Statoil filed a counterclaim against Matrix and OGE for breach of contract related to the JOA and the Rule 11 agreement.  Statoil's counterclaim against Matrix asserts: "The Matrix Defendants have failed to remit payment for the fees associated with the use of the processing and gathering facilities, including the CDP, to market their production from the date of first production to the present."  The pleading acknowledges that Statoil and Talisman "expressly reserved their rights to seek as damages the full rates for transport and process through the gathering system and CDP at the trial on the merits of this case."  The next paragraph states:

> As set forth herein, the Matrix Defendants' breach has resulted in damages to Statoil.  Statoil seeks recovery of the full rates for transport and process through the gathering system and CDP, less credit for any or interim payments paid and received pursuant to the terms of the [May 5, 2016] Rule 11 Agreement.

The breach of contract claim against OGE is similar. Statoil also asserted claims against Matrix, but not OGE, for unjust enrichment, restitution, and breach of implied contract for Matrix's use of the CDP as well as a claim for "suit on open account for use of the CDP" and a claim for "trespass upon the CDP."

At trial, Statoil did not request jury questions on elements of these causes of action against Matrix and OGE. The jury charge contained question 10a related to CDP fees, which asked:

> What is a reasonable fee for transportation to and treatment at the Cooke Ranch CDP of the following?
>
> Answer in dollars and cents, if any.
>
> (a) Natural gas per mfc:
>
> (b) Oil, condensate, and liquids per barrel:

The jury answered $0.60 for natural gas per mfc and $2.65 for oil, condensate, and liquids per barrel.

After trial, Statoil asserted in a motion for entry of judgment that Matrix and OGE owed CDP fees because the parties agreed to "bargain-basement" interim fees and the Rule 11 agreement "contemplated the recovery of fees to and *through entry of a final judgment . . . .*" (Emphasis original.) Statoil's motion cites the jury's answers to question 10a as a basis to calculate fees, and the amount Statoil requested "netted out" Matrix's and OGE's payment of CDP fees at the lower rates agreed to before trial. Statoil also moved to reopen the evidence to add information about CDP fees that Statoil wished to impose after trial and before entry of the final judgment, arguing the CDP fees were "due under the May 5, 2016 Rule 11 Agreement." The trial court granted Statoil's motion, and later entered final judgment, awarding Statoil Pipelines approximately $700,000 as interim CDP fees.

### *B. OGE's Jurisdictional Challenge*

We address OGE's jurisdictional challenge first because absent jurisdiction, we cannot address the merits. *RSL Funding, LLC v. Pippins*, 499 S.W.3d 423, 429 (Tex. 2016). OGE argues that Statoil Pipelines lacks "standing" to make a claim for recovery of CDP fees because it was not a party to the JOA or to the Rule 11 agreement. Statoil Pipelines does not dispute that it was not a party to the JOA or that it was not a party to this case when the Rule 11 agreement was entered. Instead, Statoil Pipelines argues that OGE waived its challenge to standing by failing to object in the trial court. OGE responds that it objected, and, in any event, it argues that a challenge to subject matter jurisdiction can be raised for the first time on appeal. *See id.*; *see also Linegar v. DLA Piper LLP (US)*, 495 S.W.3d 276, 279 (Tex. 2016) ("A party's standing to sue is implicit in the concept of subject-matter jurisdiction. . . ."); *L.D. Brinkman Inv. Corp. v. Brinkman*, No. 04-16-00651-CV, 2017 WL 1684836, at *2 (Tex. App.—San Antonio Apr. 26, 2017, no pet.) (mem. op.) ("Standing may be challenged for the first time on appeal.").

Although OGE frames its challenge as one directed at standing, which would implicate our subject matter jurisdiction, its challenge instead goes to capacity to sue, which is not jurisdictional. *See Estate of Matthews III*, 510 S.W.3d 106, 113–14 (Tex. App.—San Antonio 2016, pet. denied) (explaining relationship between standing and capacity). "While the question of whether a party is entitled to sue on a contract is often informally referred to as a question of 'standing,' it is not truly a standing issue because it does not affect the jurisdiction of the court; it is, instead, a decision on the merits." *Heartland Holdings Inc. v. U.S. Tr. Co. of Tex.*, 316 S.W.3d 1, 6–7 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also Moody v. Moody*, 613 S.W.3d 707, 713–14 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy."

*Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848–49 (Tex. 2005) (citation omitted). OGE's challenge to whether Statoil Pipelines was a party to the JOA and the Rule 11 agreement is a challenge to Statoil Pipelines' privity of contract. *See John C. Flood of DC, Inc. v. SuperMedia, L.L.C.*, 408 S.W.3d 645, 651–52 (Tex. App.—Dallas 2013, pet. denied) ("[P]rivity is established by proving the defendant was a party to an enforceable contract with either the plaintiff or someone who assigned its cause of action to the plaintiff."). "Texas law is clear that a challenge to a party's privity of contract is a challenge to capacity, not standing." *Douglas-Peters v. Cho, Choe & Holen, P.C.*, No. 05-15-01538-CV, 2017 WL 836848, at *10 (Tex. App.—Dallas Mar. 3, 2017, no pet.) (mem. op.); *see also John C. Flood*, 408 S.W.3d at 651–52; *Heartland Holdings*, 316 S.W.3d at 6–7.

Because OGE's "standing" challenge goes to Statoil Pipelines' capacity to sue on the Rule 11 agreement, the challenge does not implicate our jurisdiction. *See John C. Flood*, 408 S.W.3d at 651–52; *Heartland Holdings*, 316 S.W.3d at 6–7. Therefore, we are not required to address it as a threshold matter, and we do not. *Cf. RSL Funding*, 499 S.W.3d at 429. Instead, we turn to an alternative merits issue that both Matrix and OGE assert: that Statoil failed to seek or obtain a jury finding on the elements of a cause of action that could support the interim CDP awards.[49]

### C. Missing Jury Questions

Matrix and OGE both contend that interim CDP fees should not have been awarded because Statoil did not request jury questions — or secure jury findings — on any element of any claim that could support the awards. They argue the Rule 11 agreement did not relieve Statoil

---

[49] Although standing is not implicated by OGE's capacity challenge, we are satisfied that Statoil Pipelines has a justiciable interest in the outcome of the appeal as to interim CDP fees, such that it has standing. *See Austin Nursing Ctr.*, 171 S.W.3d at 848 ("The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome . . . ."). It is uncontested that Statoil Pipelines had an ownership interest in the CDP during the relevant timeframe and that Statoil Pipelines would be entitled to receive additional interim CDP fees if such fees were paid or awarded.

from the burden of prevailing on a pleaded claim at trial. Statoil responds that the trial court awarded fees pursuant to the Rule 11 agreement. In addition, it argues the awards were supported by its claim for breach of an implied contract for services.

All parties agree that the Rule 11 agreement is a contract. As a contract, construction of the Rule 11 agreement is governed by legal principles applicable to contracts generally. *Garza v. Villarreal*, 345 S.W.3d 473, 479 (Tex. App.—San Antonio 2011, pet. denied); *accord Estate of Matthews III*, 510 S.W.3d at 111. The parties, however, dispute the Rule 11 agreement's scope. According to Matrix and OGE, the agreement merely authorized Statoil to demand additional CDP fees as damages at trial. Statoil argues that the agreement was a contract,

> for [Statoil] to provide transportation and processing services to the Matrix Parties and OGE for their proportionate shares of production volumes for a specific period of time, at less than market rates, in return for the right to apply market rates (as found by the jury) to those volumes, to be assessed as damages in the final judgment.

We agree with Matrix and OGE and hold the Rule 11 agreement allowed only for the recovery of additional fees as damages through a claim proved at trial. The Rule 11 agreement expressly states the parties' agreement on "interim rates for fees charged for volumes delivered through the gathering system and CDP." However, the agreement contains no statement that a jury will be asked to determine a reasonable fee and that Matrix and OGE will owe Statoil for underpayments based upon a jury's determination.

The agreement leaves open the possibility for "damages at trial." One term states: "The parties are preserving all rights to contest the rates set out in this agreement and the Rule 11 on rates and to seek damages at trial." Another term provides: "[Talisman]/Statoil may demand it[s] full rates for transport and process through [the] gathering system and CDP as damages at the trial." The Black's Law Dictionary defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Damages*, Black's Law Dictionary (11th ed.

2019). The agreement gives a "party" — and elsewhere "Talisman/Statoil" — a right to contest rates and demand full rates as damages. We construe the agreement to generally provide any party a right to prove an injury at trial giving rise to a money claim, but hold that it does not specifically provide for Matrix and OGE to pay Statoil an adjustment based upon a jury determination, without regard to whether Statoil has established a claim. *Cf DiGiuseppe v. Lawler*, 269 S.W.3d 588, 597–98 (Tex. 2008) (holding contract allowing party to "seek to enforce" specific performance did not impose specific performance automatically upon default but required party to establish the legal elements of specific performance before the remedy would be imposed).

While the Rule 11 agreement allowed Statoil (or any party) to seek damages, Statoil did not request jury questions or obtain jury findings on any of its claims that could support the trial court's award. Statoil's claims also were not conclusively established. Under these circumstances, Statoil has waived its grounds for recovery. Rule 279 of the Texas Rules of Civil Procedure provides: "Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted [to the jury] or requested are waived." TEX. R. CIV. P. 279. Statoil's claim for breach of contract, as pled, was based on the JOA and the Rule 11 agreement. As discussed, the Rule 11 agreement did not require Matrix and OGE to pay Statoil additional CDP fees based upon the jury's determination of reasonable fees, and, on appeal, Statoil asserts the JOA "has nothing to do with the charging of CDP fees." Statoil also argues on appeal that its claim for breach of an implied contract for services can support the interim CDP fee awards. However, the evidence does not conclusively establish an implied contract between Matrix (or OGE) and Statoil. Rather, the JOA provides an express mechanism for the Operator, which at the time was Talisman, to subtract costs from net revenue owed to a working interest owner, such as Matrix. This mechanism would defeat the need for a direct contract, either express or implied, between Matrix (or OGE) and Statoil.

Because Statoil did not submit any jury questions on any of its claims for damages related to interim CDP fees and its claims for interim CDP fees are not conclusively established, we cannot deem findings in support of the trial court's awards. *See* TEX. R. CIV. P. 279; *DiGiuseppe*, 269 S.W.3d at 599; *J & C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 638 (Tex. App.—San Antonio 1993, no writ). Therefore, we reverse the trial court's awards for interim CDP fees and its declaration that Statoil Pipelines is entitled to the awards under the Rule 11 agreement. *See* TEX. R. CIV. P. 279; *DiGiuseppe*, 269 S.W.3d at 599; *J & C Drilling Co.*, 866 S.W.2d at 638.[50]

## VIII. Damages against Matrix for Unpaid Expenses

Matrix also challenges the damages awards totaling $4,651,440 to Talisman for unpaid expenses related to 13 wells Talisman drilled prior to commencement of this litigation. The trial court made the award, but it did not award prejudgment interest based upon the jury's finding to question 9c that Matrix's "failure to comply with the JOA in a timely manner [was] excused." Matrix argues that this finding of excused failure to timely comply should apply to the entire award, so that it owes nothing. Talisman argues the trial court correctly awarded damages without prejudgment interest because the phrase "in a timely manner" in the jury question limited the question to prejudgment interest only. Matrix responds that the jury would not have read the words "in a timely manner" as narrowing the scope of the question to prejudgment interest only. In essence, this dispute turns on the proper construction of jury question 9c.[51]

---

[50] We specifically reverse Declaration SRD 21.

[51] As a threshold matter, we reject Matrix's contention that Talisman waived its arguments in support of the judgment by failing to specifically object to any ambiguity in the jury question because (1) Matrix, not Talisman, asserts error on appeal, *see* TEX. R. APP. P. 33.1(a); (2) Matrix, not Talisman, had the burden to submit the issue of its affirmative defense of excuse to the jury, *see Casa El Sol-Acapulco, S.A. v. Fontenot*, 919 S.W.2d 709, 715 (Tex. App.—Houston [14th Dist.] 1996, writ dism'd by agr.); and (3) Matrix relies on authority concerning the omission of jury questions from a charge, rather than authority addressing the ambiguity of jury questions within the charge. *Compare Mason v. S. Pac. Transp. Co.*, 892 S.W.2d 115, 117 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (waiver where party failed to object to omission of question) *with Jackson v. U.S. Fid. & Guar. Co.*, 689 S.W.2d 408, 409 (Tex. 1985) (construing ambiguous jury charge submitted without objection).

### A.  Standard of Review

A trial court's judgment must conform to the verdict.  *See* TEX. R. CIV. P. 301; *see also Daneshjou v. Bateman*, 396 S.W.3d 112, 115 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (plurality op.).  When faced with competing interpretations of the verdict, we give the jury charge a "commonsense interpretation, gleaned from both the text of the charge and the context of the case." *Mem'l Hermann Health Sys. v. Gomez*, 649 S.W.3d 415, 423 (Tex. 2022).  "When faced with ambiguous jury findings, a reviewing court must interpret the charge such that the findings uphold the judgment." *Id.*  We "read jury instructions like jurors do — with common sense." *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 772 n.3 (Tex. App.—Houston [14th Dist.] 2004, no pet.).  If only one interpretation is reasonable, the verdict must be read in accordance with that interpretation, even if an unreasonable interpretation would better align with the judgment.  *See Mem'l Hermann*, 649 S.W.3d at 423–24.  However, if two interpretations are reasonable, we must interpret the verdict so as to uphold the trial court's judgment.  *See Jackson*, 689 S.W.2d at 412; *see also Mem'l Hermann*, 649 S.W.3d at 423–24.

### B.  Analysis

Talisman's proposed interpretation of jury question 9c is reasonable and supports the trial court's judgment.  *See Jackson*, 689 S.W.2d at 412.  Jury question 9a asked: "Did [Matrix] fail to comply with the JOA by failing to pay Talisman [Matrix's] share of costs and expenses . . . ?"  The jury answered "Yes."  Question 9b asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Talisman for its damages, if any, that resulted from such failure to comply?"  The jury responded, specifying damages.  Question 9c asked: "Was [Matrix's] failure to comply with the JOA *in a timely manner* excused?"  (Emphasis added.)

Talisman's assertion that question 9c concerns only prejudgment interest flows naturally from reading the charge as a whole.  *See L & S Meats, LLC v. USA Feedyard, LP*, No. 07-18-

00030-CV, 2020 WL 371726, at *3 (Tex. App.—Amarillo Jan. 22, 2020, pet. denied) (mem. op.) (appellate courts review jury questions from the "viewpoint . . . of a juror untrained in the law" and "afford[] a reasonable, as opposed to technical, construction"). Question 9c added the phrase "in a timely manner," which is absent from questions 9a and 9b. Talisman's narrowing construction gives effect to this phrase, which Matrix would read out of the charge. *Cf. Burlington Res.*, 573 S.W.3d at 203 ("We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of [a] contract so that none will be rendered meaningless." (citation omitted)).[52]

Context also confirms the reasonableness of Talisman's proposed construction. *See Mem'l Hermann*, 649 S.W.3d at 423 (considering "context of the case" and evidence adduced when determining reasonableness of proposed construction). Evidence at trial suggested that the timeliness of Matrix's expense payments to Talisman was in dispute. The jury heard testimony that before December 2013, Matrix withheld payment to Talisman after discovering billing discrepancies. In December 2013, Matrix paid Talisman the expenses it had withheld in an effort to restore the parties' relationship. The relationship eventually deteriorated again. The jury reasonably could have understood from this trial testimony that Matrix's excuse for withholding payments that were later paid raised an issue of timeliness of payments that was distinct from the issue of whether payments were owed at all. In addition, Matrix pleaded for prejudgment interest. *See id.* at *7 (pleadings can assist our interpretation).

---

[52] Question 9c also departs from the language of the pattern jury charge, which, like questions 9a and 9b, does not include timeliness language. *See* TEX. PATTERN JURY CHARGES: *Business* PJC 101.21 (2016) ("Was *Don Davis*'s failure to comply excused?").

In short, we hold Talisman offers a reasonable interpretation of question 9c, which the trial court adopted; therefore, we must uphold the trial court's judgment based on this reasonable interpretation. *See Jackson*, 689 S.W.2d at 412.

## IX. Texas Natural Resources Code Penalties

The trial court awarded Matrix $3,000,719 as a penalty under the Texas Natural Resources Code as interest on amounts due, but untimely paid, from Talisman to Matrix. Section 91.402 of the Natural Resources Code requires, with some exceptions not applicable here, that proceeds from the sale of oil must be paid to a working interest owner within sixty days after the end of the month in which subsequent oil production is sold and, for gas, within ninety days. *See* TEX. NAT. RES. CODE ANN. § 91.402(a). The jury charge, in question 8a, asked whether Talisman failed to timely pay Matrix under these deadlines, and the jury answered "Yes." In question 8b, the charge asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Matrix] for its damages, if any, that resulted from failure to pay those proceeds." The jury answered $12,584,940. On appeal, Matrix argues that it is entitled to the full $12,584,940 amount found by the jury in addition to the $3,000,719 penalty amount, which the trial court calculated based off the jury's $12,594.940 finding. Talisman argues that there is no jury finding that it *never* paid; therefore, according to Talisman, only the penalty award the trial court calculated could be supported by the verdict.

We agree with Talisman that jury question 8 concerns only late payment of proceeds under the Natural Resources Code and that the question does not concern whether payment was ever made; therefore, the verdict can only support the penalty award calculated by the trial court. Question 8a(a) asked: "Did Talisman fail to pay [Matrix] proceeds due on oil production 60 days after the end of the calendar month in which subsequent oil production is sold?" Question 8a(b) asked: "Did Talisman fail to pay [Matrix] proceeds due on gas production within 90 days after the

end of the calendar month in which subsequent gas production is sold?" These questions reflect the deadlines stated in the Natural Resources Code, and they solicit answers regarding timely payment, not ultimate payment. Question 8b requires an affirmative response to question 8a before it is reached, and it asks: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Matrix] for its damages, if any, that resulted from failure to pay those proceeds." Because question 8b references question 8a, "damages . . . from failure to pay those proceeds," reasonably means only damages from Talisman's failure to pay proceeds within the sixty- and ninety-day deadlines referenced in question 8a. *See Mem'l Hermann*, 649 S.W.3d at 423–24; *L & S Meats*, 2020 WL 371726, at \*4.

The context of the case confirms our commonsense reading of question 8b. *See Mem'l Hermann*, 649 S.W.3d at 418 ("[T]he plain text of the charge must be given its commonsense meaning in the context of the case."). At the jury charge conference, counsel for Talisman stated that question 8a concerned whether Talisman failed to pay proceeds of production within sixty or ninety days. Counsel argued that the question was duplicative of the underlying liability findings. Counsel for Matrix described question 8b as a question concerning "how much [Talisman] didn't pay." In post-trial briefing, Matrix stated:

> Questions 8a and 8b relate to [Matrix's] recovery under Section 91.402 and 91.403 of the [Texas Natural Resources Code]. Section 91.402 requires the payor (here, Talisman) to make timely payments, and Section 91.403(a) authorizes an award of interest if the payor fails to do so. Questions 8a and 8b did exactly what the statute required, which is to ask whether Talisman made untimely payments, and then to ask the amount of the untimely payments. It is then the trial court's role to calculate the amount of interest owned [sic] on the untimely payments.

*See* TEX. NAT. RES. CODE ANN. §§ 91.402(a), .403. The trial court calculated the interest amount, just as Matrix described.

We hold Question 8 concerned only untimely payment, and Matrix did not request a jury finding on whether Talisman ever paid proceeds of production. Whether Talisman ultimately paid

was disputed at trial. Matrix's Vice President of Finance, Steve Ives, acknowledged that Talisman "on the eve of trial" gave Matrix a "credit against . . . disputed charges."[53] Because Talisman's failure to ultimately pay is not conclusively established by the evidence, Matrix waived its ground of recovery by failing to request and have submitted to the jury a question regarding ultimate payment. *See* TEX. R. CIV. P. 279; *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222–23 (Tex. 1992). We overrule Matrix's issue that the trial court erred by failing to award Matrix $12,584,940, in addition to the penalty amount for untimely payment.

## X. Attorneys' Fees

Last, the parties contest the attorneys' fees awards.

### A. Attorneys' Fees Awards to Matrix and OGE against Talisman

The trial court awarded Matrix $3,053,735 and OGE $328,650 as attorneys' fees under the Texas Natural Resources Code. Talisman argues for reversal of these awards and for a new trial on fees under the Natural Resources Code because Matrix failed to prove the amount of reasonable and necessary attorneys' fees and failed to segregate time spent on its various claims. Matrix does not oppose a remand for a new trial on fees.

Likewise, Talisman argues that OGE failed to segregate its time spent on its Natural Resources Code claim from time spent on all other claims. OGE opposes a remand and asserts, without providing record cites, that its counsel's fee affidavit segregated fees by claim and by party. Having reviewed the affidavit, we agree with Talisman that OGE has not segregated fees related to its Natural Resources Code claim from all other claims. Counsel's affidavit only

---

[53] Citing only section 91.402(a), Matrix argues that a producer does not comply with the requirement to timely "pay" by crediting proceeds against amounts owed. We reject this contention. Section 91.402(d) provides a form division order that allows for payment "less taxes," and "pay," broadly understood, encompasses the action "to make satisfaction." *See* TEX. NAT. RES. CODE ANN. §§ 91.402(d); *Pay*, Black's Law Dictionary (11th ed. 2019); *see also Thompson v. Tex. Dep't of Licensing & Regul.*, 455 S.W.3d 569, 570 (Tex. 2014) (per curiam) ("Where a statutory term is undefined, that term is imbued with the plain meaning as commonly understood at the time of enactment.").

segregates fees related to claims for conversion and breach of fiduciary duty, but it leaves fees related to all other claims combined. Because OGE's attorneys' fees are allowed only for its Natural Resources Code claim, we reverse the attorneys' fees award and remand for a new trial on fees. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006).[54] Likewise, because Matrix's attorneys' fees are allowed only for its Natural Resources Code claim and because Matrix does not dispute that its fees are unsegregated, we reverse the attorneys' fees award to Matrix and remand for a new trial on fees.

### B. Attorneys' Fees Award to Statoil against Matrix

Matrix appeals the trial court's award to Statoil of attorneys' fees in the amount of $300,000.[55] Statoil requested attorneys' fees pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, which authorizes a trial court to award fees "as are equitable and just" in a proceeding for declaratory judgment. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. "[A]fter a declaratory judgment is reversed on appeal, an attorney's fees award may no longer be equitable and just." *Kartsotis v. Bloch*, 503 S.W.3d 506, 520 (Tex. App.—Dallas 2016, pet. denied). Here, we reverse declarations in Statoil's favor related to the Term Assignees' consent to drill wells. Statoil's motion for attorneys' fees argued for an award of fees based, in part, on Statoil's success in obtaining these declarations, and the record is silent as to whether the trial court would deem its attorneys' fees award to Statoil against Matrix equitable and just absent these declarations. Therefore, in the interest of justice, we remand the case to the trial court for a determination as to what award of attorneys' fees, if any, to Statoil against Matrix is equitable and just in light of our

---

[54] Talisman requests that we suggest a remittitur of OGE's fees to $150. *See* TEX. R. APP. P. 46.3. OGE asks that if we reverse the attorneys' fees award, we remand. Based on OGE's request, we remand for a new trial on OGE's attorneys' fees. *See Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 642 (Tex. 1987) (party prevailing in trial court is given option of accepting remittitur or having case remanded for new trial); *see also Arkoma Basin Expl. Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 390 (Tex. 2008).

[55] The trial court also awarded Statoil attorneys' fees under the Natural Resources Code against OGE in the amount of $75,000, but OGE does not appeal this award; therefore, we leave it undisturbed.

holdings. *See* TEX. R. APP. P. 43.3(b); TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; *Kartsotis*, 503 S.W.3d at 521; *see also Waldrop v. Waldrop*, 552 S.W.3d 396, 411–12 (Tex. App.—Fort Worth 2018, no pet.); *Grohman-Kahlig v. Kahlig*, No. 04-07-00468-CV, 2008 WL 5377704, at *1 (Tex. App.—San Antonio Dec. 17, 2008, no pet.) (mem. op.).

### C. Denial of Attorneys' Fees Award to Matrix against Talisman

When Matrix filed its lawsuit in 2014, it asserted claims against Talisman Energy USA, Inc., a corporation. During the course of litigation, the corporation changed names and converted into the limited liability company Repsol Oil and Gas USA, LLC (which we have defined as "Talisman"). When the trial court entered its initial judgment and later its amended final judgment, Talisman was a limited liability company. At that time, the version of Chapter 38 of the Texas Civil Practice and Remedies Code in effect allowed for an award of attorneys' fees on a breach of contract claim against a corporation but not against a limited liability company. *See* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242 (amended 2021) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 38.001); *8305 Broadway Inc. v. J & J Martindale Ventures, LLC*, No. 04-16-00447-CV, 2017 WL 2791322, at *5 (Tex. App.—San Antonio June 28, 2017, no pet.) (mem. op.).[56] Because Talisman was a limited liability company when the trial court entered its judgment, the trial court denied Matrix an attorneys' fees award against Talisman under Chapter 38.

Matrix appeals this denial. It argues that Talisman breached the JOA when it was a corporation and that Talisman, as a corporation, incurred a "contingent liability" for attorneys'

---

[56] The current version of the statute, which took effect in 2021, permits recovery of attorneys' fees against a limited liability company. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(a) (incorporating Business Organizations Code meaning of "organization"); TEX. BUS. ORGS. CODE ANN. § 1.002(62) (defining "organization" to include a limited liability company); *see also Target Corp. v. D&H Props., LLC*, 637 S.W.3d 816, 840 n.7 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

fees related to the breach that Talisman remained liable for after its conversion to a limited liability company. Texas Business Organizations Code section 10.106(3) provides: "all liabilities and obligations of [a] converting entity continue to be liabilities and obligations of the converted entity in the new organizational form without impairment or diminution because of the conversion." TEX. BUS. ORGS. CODE ANN. § 10.106(3). Pointing to this section, Matrix argues that a limited liability company, after conversion from a corporation, can be liable for attorneys' fees arising from claims based on the actions of the corporation. Talisman responds that section 10.106(3) is not applicable because Talisman had not incurred a liability or obligation related to attorneys' fees at the time of conversion. According to Talisman, liability for attorneys' fees arises only after a party prevails on an underlying claim and recovers damages.

We do not resolve the matter of whether attorneys' fees are "contingent liabilities" which a converted entity may be liable for after conversion under section 10.106(3) of the Business Organizations Code because section 38.001 of the Civil Practice and Remedies Code focuses on "recover[y]" from entities, and not liability. The statute lists the persons from whom a prevailing party "may recover" attorneys' fees. The applicable version provides: "A person may recover reasonable attorney's fees from an individual or corporation . . . if the claim is for: . . . an oral or written contract." Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242 (amended 2021). Regardless of whether Talisman may be liable for attorneys' fees under the Business Organizations Code, the Civil Practice and Remedies Code, by its plain language, precludes Matrix's *recovery* of such fees from a limited liability company on a contract claim. *See 8305 Broadway*, 2017 WL 2791322, at *5; *see also Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 557 (Tex. 2022) ("When construing a statute, our primary objective is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen."). Because it is undisputed that Talisman was a limited liability company when the

trial court entered its judgment, we hold the trial court did not err by denying Matrix's request for recovery of attorneys' fees from that limited liability company under Chapter 38.

CONCLUSION

We dismiss Statoil Texas's appeal as to its issues challenging the trial court's failure to declare that the Term Assignments' three-well-per-year drilling obligation obligated the Term Assignees to each other to drill three wells per year; challenging the trial court's determination that the parties did not join issue on the enforceability of the Term Assignments three-well-per-year drilling obligation between the Term Assignees; challenging the trial court's declaration that the Operator must ensure there are "sufficient facilities" to allow a working interest owner to take production in kind; and challenging whether the trial court erred by awarding declaratory relief to OGE against Statoil Texas, except as to declarations regarding the October 2016 Wells.

We reverse the trial court's award relating to the "missing volumes" of production and render judgment that Matrix and OGE take nothing on this claim.

We reverse the trial court's award to OGE as to its share of production from the October 2016 Wells and render judgment that OGE takes nothing on this claim.

We reverse the trial court's declarations regarding unanimous consent to drill; establishing three categories of "participating member," "nonparticipating member," and "nonconsenting member;" and regarding the Term Assignees' consent to drill. We render the following declarations:

> The JOA provides that no new well may be drilled without the consent of all members of the JOA, unless the members are obliged to drill it, under obligations in the underlying leases, to prevent drainage, and/or to reasonably develop, or if the balloting and non-consent-penalty provisions of Section 8 are complied with.

> The Term Assignments do not mandate that a Term Assignee consent to the drilling of a well under JOA Section 8.

Matrix Holdings, JAR, TMRX, and OGE did not agree to drill any of the October 2016 Wells, and each is subject to a non-consent penalty, pursuant to JOA Section 8, as to these wells.

We reverse the trial court's award of damages to Matrix for expenses incurred above $2,500 before Matrix granted its consent to drill as well as related declarations, and we render judgment that Matrix takes nothing on this claim.

We reverse the trial court's award to Matrix as to the TEAK pipeline bonus and render judgment that Matrix takes nothing on this claim.

We reverse the trial court's award to Matrix as to internal marketing fees and render judgment that Matrix takes nothing on this claim.

We reverse the trial court's award to Statoil Pipelines as to interim CDP fees and render judgment that Statoil Pipelines takes nothing on this claim.

We reverse the trial court's attorneys' fees awards for Matrix and for OGE against Talisman under the Texas Natural Resources Code, and we reverse the trial court's attorneys' fees award to Statoil against Matrix under Chapter 37 of the Civil Practice and Remedies Code. We remand the case for a new trial on attorneys' fees consistent with this opinion.

We otherwise affirm the trial court's Amended Final Judgment.

Rebeca C. Martinez, Chief Justice